IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No: 4:21- CV- 63

| | | |
|---|---|---|
| RONNIE WALLACE LONG, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF CONCORD, VAN WALTER | ) | |
| ISENHOUR, in his Individual Capacity; | ) | |
| DAVID JOHN TAYLOR, in his | ) | **COMPLAINT** |
| Individual Capacity; the Estate of | ) | |
| GEORGE MONROE VOGLER, JR.; the | ) | **(Jury Trial Demanded)** |
| Estate of MARSHALL JAMES LEE; the | ) | |
| Estate of JACK MOORE; MERL | ) | |
| HAMILTON, in his Official Capacity; | ) | |
| GUY SMITH, in his Official Capacity; | ) | |
| GARY GACEK, in his Official Capacity; | ) | |
| and JOHN and JANE DOES 1–10, in | ) | |
| their Individual Capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Ronnie Wallace Long, by and through his undersigned counsel, complains of

Defendants City of Concord, Van Walter Isenhour, David John Taylor, the Estate of George

Monroe Vogler, Jr, the Estate of Marshall James Lee, the Estate of Jack Moore, Merl Hamilton,

Guy Smith, Gary Gacek, and John and Jane Does 1–10, as follows:

## INTRODUCTION

1.    On October 1, 1976, Ronnie Wallace Long ("Long") was wrongfully convicted and

sentenced to life imprisonment for burglary and the rape of Sarah Grayson Bost ("Bost") in

Concord, North Carolina on April 25, 1976. Long was innocent of those charges.

2.     Long served 44 years, three months, and 17 days in prison for crimes he did not commit. On December 17, 2020, Governor Roy Cooper granted Ronnie Long a full and absolute Pardon of Innocence.

3.     Long's convictions were not merely the result of mistake, negligence, or incompetence. They were the direct result of the intentional and/or reckless misconduct of members of the Concord Police Department ("CPD"). His wrongful incarceration was unnecessarily extended due to the deliberate indifference and intentional and/or reckless misconduct of CPD and the City of Concord.

4.     At the time of his arrest, Ronnie Long was a twenty-year-old cement mason with no felony convictions. He had a two-year-old son. On the night Bost was raped, Long was with friends planning a high school reunion party. CPD investigators knew that Long had an airtight – and factually supportable – alibi and that he could not have been the perpetrator of the Bost rape.

5.     The rape victim was the widow of a long-time executive of Cannon Mills and the case was high-profile. There was a great deal of public pressure on CPD to make an arrest in the case. Cannon Mills posted a $10,000 reward for information leading to an arrest. Days went by and CPD investigators had not solved the case.

6.     Officers with the CPD – Van Walter Isenhour ("Isenhour"), David John Taylor ("Taylor"), George Monroe Vogler, Jr. ("Vogler"), and Marshall James Lee ("Lee") – decided to target Ronnie Long as a suspect even though he did not match the victim's description of her assailant and no evidence suggested Long's involvement in the crime. These officers had a history of animus toward the Long family and had hassled Ronnie Long in the past.

7.      Bost described her attacker as "light-skinned" and as a "yellow black man." Long is a dark-skinned Black man. Bost initially made no mention of her attacker having facial hair. Long wore a mustache and scruffy beard at that time.

8.      These officers – Isenhour, Taylor, Vogler, and Lee – planned to have the victim identify Long as her assailant because there was no evidence linking Long to the crime. To ensure that the victim picked out Long, these officers orchestrated an impermissibly suggestive in-court identification. Because they needed Long in court for this charade of an identification, the officers manufactured a bogus misdemeanor trespassing charge against Long which was later dismissed. The sole purpose of the trespassing charge was to have Long appear in district court where the officers planned to have the victim identify Long as her assailant.

9.      The impermissibly suggestive in-court identification was orchestrated by Isenhour, Taylor, Vogler, and Lee. The officers arranged for Bost to meet them at district court on May 10, 1976, wearing a wig and glasses as a disguise, for the purpose of identifying the man who had raped her fifteen days earlier.

10.      As instructed by CPD investigators, the victim spent an hour to an hour and a half looking about the courtroom for her assailant. Taylor and Lee were in the jury box and visible to both the victim and Long. There were approximately three dozen people in the courtroom that morning; ten to twelve were Black men. Only when the judge called Long's name and ultimately dismissed the trespassing charge did Bost supposedly identify Long as her attacker.

11.      CPD officers had a recent booking photograph of Long that was taken in connection with Long's arrest on the bogus trespassing charge. Though they had earlier used a photo lineup with the victim while she was in the hospital and could have used a photo lineup including a recent

photo of Long, they opted for the unreasonably suggestive courtroom procedure so as to ensure that Bost misidentified Long as her assailant.

12. CPD officers, including Taylor and Vogler, then reinforced the victim's mistaken identification by having her pick Long out of a misleading photo array. Investigators "marked" Long as the perpetrator – Long was the only one in the photo spread wearing a leather jacket, that article of clothing being one of the only consistent aspects of the description of her attacker. At least one of the other subjects "looked like a woman." In sworn testimony, the victim acknowledged that the officers may have simply instructed her to pick out Ronnie Long.

13. On the evening of May 10, 1976, CPD officers lied to Long and his parents, telling them that Long was needed at the police station to "straighten out" something with the trespass charge that had been dismissed earlier that day. Officers assured Long's parents that it was a minor matter and that Long did not need to have an attorney present.

14. At the police station, the officers questioned Long about the Bost rape and he truthfully told them that he had nothing to do with it. CPD investigators seized items of Long's clothing – a leather jacket and his shoes. Without obtaining consent and without informing Long of his right to withhold consent, CPD officers searched the Long family car and seized matchbooks and a pair of black leather driving gloves. Officers also claimed to have found a green toboggan under the front seat of the Long family car.

15. At the time CPD investigators questioned Long about the Bost rape, upon information and belief, they knew that none of the crime-scene fingerprints matched him. Isenhour had obtained Long's prints when Long was arrested on the bogus misdemeanor trespassing charge on April 30, 1976. Isenhour thereafter compared Long's fingerprints against the latent lifts from the crime-scene. None matched Long because he had never been inside the Bost home.

16.     Despite Long's denials of any involvement in the crime and the fact that CPD investigators knew that no fingerprints left at the crime-scene were matched to him, CPD investigators proceeded with false charges against Long. Based upon the eyewitness manipulation that CPD officers orchestrated and the misleading version of the case they presented, Long was indicted and falsely arrested for first-degree burglary and first-degree rape. David Taylor was the sole witness before both the magistrate who approved the arrest warrants and the grand jury which issued the indictments against Long.

17.     After Long was charged, CPD investigators obtained additional evidence of his innocence, including exculpatory lab reports prepared by analysts at the State Bureau of Investigation ("SBI"). CPD investigators systematically suppressed every bit of evidence which showed there was no link between Long and the victim or the crime-scene. They hid – from prosecutors and Long's defense team – evidence that investigators were obligated to report and produce pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny.

18.     Long was tried before an all-white jury in a tense and extremely racially polarized atmosphere. Three of Long's jurors worked at Cannon Mills and a fourth was married to a Cannon Mills employee. Prior to trial, the Sheriff of Cabarrus County, JB Roberts, and the CPD Chief of Police, Jack Moore ("Moore") and some of his officers (names currently unknown), participated in an unrecorded process in which the jury roll was pre-screened so that, according to the Sheriff, "undesirables" could be removed from the list. Thus, of the ninety-nine prospective jurors that Long's trial team would see, four were Black. None were selected to serve on Long's jury.

19.     The CPD investigators – Isenhour, Taylor, Vogler, and Lee – suppressed every bit of evidence which would have undercut the victim's mistaken identification of Long. They hid – from prosecutors and Long's defense team – multiple exculpatory SBI lab reports which showed

no link whatsoever between Long and the crime. Those Defendants also withheld other evidence that they were obligated to disclose – both to prosecutors and to Long and his attorneys.

20.    The evidence that CPD investigators suppressed would remain hidden and unknown to Long or his attorneys for many years. The evidence – all of which should have been disclosed to Long's trial team in 1976 – trickled out over decades, with the most recent disclosure of <u>Brady</u> materials being made in July 2015, some 41 years after it should have been produced.

21.    The actions and tactics of CPD investigators described in this Complaint were sanctioned and condoned by CPD Chief of Police Jack Moore ("Moore") and the City of Concord.

22.    Because of Defendants' misconduct, the jury, in a case in which two life sentences were sought, never learned the following:

- Sixty-eight (68) latent fingerprint lifts were collected at the crime-scene, but no fingerprints were matched to Ronnie Long.

- Of the five matchbooks seized from the Long family car, four were definitively excluded as possible origins of burned matches found in the Bost home and, according to an SBI analyst, the burned matches "probably did not originate" from the fifth matchbook.

- SBI analysts found no paint or carpet fibers from the Bost home on Long's clothing.

- SBI analysts detected no hairs or hair fragments from Ronnie Long on the victim's clothing.

- CPD, at one time, had considered individuals other than Ronnie Long to be "alternate suspects."

- A sexual assault evidence kit was obtained at the hospital and the evidence was concealed by CPD investigators who either knew or believed it would prove Long's innocence.

- An SBI report regarding comparison between Long's shoes and the latent shoe-bottom impression from the crime-scene reported "there were an insufficient number of distinct characteristics noted by which to effect any identification."

- A suspect hair with a reddish sheen found at the crime-scene was different from Ronnie Long's hair and Long was excluded as a possible source of the suspect hair.

23. In addition to unlawfully withholding exculpatory and impeachment evidence from prosecutors and Long's defense team, three of the individual Defendants – Isenhour, Vogler, and Taylor – presented untruthful testimony at trial:

- Isenhour falsely testified that he took only Long's shoes, inked impressions of those shoe bottoms, and a latent shoeprint lift from the crime-scene to the SBI Lab. In fact, he had taken some 15 items of evidence for analysis.

- Isenhour falsely testified that clothing seized from Long – the jacket and gloves, along with the toboggan officers claimed to take from the Long family car – had remained in his possession at all times. In fact, those items were taken to the SBI where analysis confirmed that no paint or carpet fibers from the victim's house was present on them.

- Isenhour falsely testified that he waited at the SBI with the items he submitted for analysis and that the items never left his custody. In fact, Isenhour left the items at the SBI and retrieved the evidence and the SBI Lab reports approximately a week later.

- Taylor falsely testified that no comparison between burned matches found at the Bost residence and matchbooks seized from the Long family car had been undertaken. He also testified that the matches were of a "similar nature." In fact, an SBI analyst had definitively excluded four of the matchbooks from the Long car as the source and reported that the matches "probably did <u>not</u> originate from [the other] matchbook." (emphasis added)

- Isenhour and Vogler also offered similar false testimony regarding the likelihood that the burned matches found at the crime-scene originated from the matchbooks in the Long family car. Vogler told the jury they were the "same type of match" and Isenhour testified that they were matches "of a similar nature." In fact, both Isenhour and Vogler knew the SBI had concluded that four of the matchbooks in the Long car could not have been the source and the fifth matchbook probably was <u>not</u> the origin.

- Taylor falsely asserted before the jury that the victim consistently said her assailant had a moustache and "hair on the side of his face and maybe a beard" while her initial descriptions of the man made no mention of facial hair. In actuality, the victim's initial description of the perpetrator did not match Long and changed over time – as she met with CPD investigators.

- Isenhour, when asked about "latent evidence" at the crime-scene, mentioned <u>only</u> the shoe-bottom impression. He concealed the facts that 68 latent fingerprint lifts had been recovered and that none of the fingerprints matched Long.

24. CPD investigators, with the assent and condonation of CPD Chief of Police Moore, engaged in a malicious conspiracy to conceal evidence from prosecutors and from Long's defense team. As a result, the jury never learned that forensic evidence from the crime-scene pointed to Long's innocence. The jury never heard about alternate suspects or that crime-scene fingerprints and a suspect hair found at the site of the assault did not match Long.

25. Unaware of their misconduct and lies, the prosecutor vouched for the investigators' integrity and their "perfect honesty." He argued that the victim's account was "corroborated by physical evidence" and "totally consistent with every piece of physical evidence existent." The prosecutor could not have made those arguments if he had known of all the evidence that pointed to Long's innocence. Indeed, absent the investigators' misconduct in fabricating inculpatory evidence and withholding exculpatory evidence, there was no probable cause to even charge Long.

26. On the basis of a mistaken witness identification which Defendants orchestrated, Ronnie Long was convicted, on October 1, 1976, of first-degree rape and first-degree burglary. He was sentenced to two concurrent life sentences.

27. Long spent the next 44 years trying to prove what he told CPD investigators when they first questioned him – he was innocent and had nothing whatsoever to do with the rape of Ms. Bost. Defendants consistently, and in bad faith, obstructed Long's efforts to obtain meaningful post-conviction review of his case and to prove his innocence.

28. The City of Concord and the Concord Police Department failed and refused to conduct proper searches for any remaining evidence from the initial investigation and allowed a grossly deficient evidence maintenance system to remain in place. As a result, evidence which

would eventually lead to Long's exoneration – <u>evidence which should have been produced to Long's defense team in 1976</u> – trickled out over the course of four decades.

29.     Because the City of Concord and the Concord Police Department failed in their duty to properly store, inventory, and safekeep crime-scene evidence and documentation, Long's efforts to obtain meaningful access to the courts were stymied. Evidence which could have led to apprehension of the actual perpetrator of the Bost rape was destroyed and/or lost.

30.     This action seeks to compensate Ronnie Long for the 44 years he spent in prison as an innocent man and for the continuing effects of his wrongful incarceration.

31.     As a direct and proximate result of Defendants' willful, wanton, reckless and deliberately indifferent acts and omissions, Long sustained injuries and damages, including, among others, the following: personal injuries, physical injuries, physical pain and mental suffering, severe emotional distress, loss of income, humiliation, indignities and embarrassment, degradation, and restrictions on all facets of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, family relations, reading, enjoyment of life, and expression of his own desires and interests.

## <u>JURISDICTION AND VENUE</u>

32.     Long brings this action under 42 U.S.C. § 1983 for acts committed by Defendants under color of state law which deprived him of liberty without due process of law, in violation of his rights under the United States Constitution.

33.     This action arises under the Constitution and laws of the United States. This Court has original jurisdiction over Long's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

34.     This Court has pendent jurisdiction over Long's state-law claims pursuant to 28 U.S.C. § 1367(a) because they are part of the same case and controversy described by Plaintiff's federal claims, and independent original jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1332.

35.     Pursuant to U.S.C. § 1391(b), venue is proper in the United States District Court for the Eastern District of North Carolina as a substantial part of the events or omissions giving rise to the claims at issue in this matter occurred in this District.

## PARTIES

36.     Ronnie Wallace Long is a citizen and resident of Harnett County, North Carolina.

37.     Long is now 65 years old. Before he was charged with the rape of Sarah Grayson Bost, Long was a 20-year-old cement mason residing in Cabarrus County, North Carolina.

38.     Defendant City of Concord is a municipal corporation organized under the laws of the State of North Carolina. The Concord Police Department ("CPD") is, and was at all times pertinent to this action, a department of the Defendant City of Concord.

39.     Defendant Van Walter Isenhour ("Isenhour") is, upon information and belief, a citizen and resident of the State of Georgia. At all times relevant to this Complaint, Isenhour was employed as a detective with CPD. Defendant Isenhour is sued in his individual capacity for acts taken under color of state law and within the course and scope of his employment.

40.     Defendant David John Taylor ("Taylor") is, upon information and belief, a citizen and resident of Cabarrus County, North Carolina. At all times relevant to this Complaint, Taylor was employed as a detective with CPD. Defendant Taylor is sued in his individual capacity for acts taken under color of state law and within the course and scope of his employment.

41.     Upon information and belief, George Monroe Vogler, Jr. ("Vogler") is deceased, and Nancy Tucker Vogler is the Administratrix of the Estate of George Monroe Vogler, Jr. At all times relevant to this Complaint, Vogler was employed as a detective with CPD. Vogler is sued in his individual capacity for acts taken under color of state law and within the course and scope of his employment.

42.     Upon information and belief, Marshall James Lee ("Lee") is deceased and Carolyn Darlene Lee is the Administratrix of the Estate of Marshall James Lee. At all times relevant to this Complaint, Lee was employed as a detective with CPD. Lee is sued in his individual capacity for acts taken under color of state law and within the course and scope of his employment.

43.     Upon information and belief, Jack Moore ("Moore") is deceased and Julia Grohse is the Administratrix of the Estate of Jack Moore. From 1975 to 1987, Moore served as Chief of Police for the Concord Police Department and was Chief of Police at the time of the investigation and trial of Ronnie Long. As Chief of Police, Defendant Moore was the final policymaker for CPD with respect to policymaking and all law enforcement investigations and functions within that jurisdiction. As Chief of Police, Defendant Moore was vested with final policymaking authority for CPD and the City of Concord with respect to law enforcement investigations undertaken by CPD, supervision, training, and discipline of CPD personnel, and maintenance, inventorying, storage, and safekeeping of crime-scene evidence under the custody of CPD. Defendant Moore is sued in his individual and official capacity.

44.     Defendant Merl Hamilton ("Hamilton") was Chief of Police for the Concord Police Department from 2001 to 2010 and also served as interim Chief from March 2, 2015, until July 2015. During that time, Defendant Hamilton was the final policymaker for CPD with respect to policymaking and law enforcement functions within that jurisdiction. As Chief of Police,

Defendant Hamilton was vested with final policymaking authority for CPD and the City of Concord with respect to maintenance, inventorying, storage, and safekeeping of crime-scene evidence under the custody of CPD. Defendant Hamilton is sued in his official capacity.

45.     Defendant Guy Smith ("Smith") was Chief of Police for the Concord Department from October 2, 2011, to March 1, 2015. During that time, Defendant Smith was the final policymaker for CPD with respect to policymaking and law enforcement functions within that jurisdiction. As Chief of Police, Defendant Smith was vested with final policymaking authority for CPD and the City of Concord with respect to maintenance, inventorying, storage, and safekeeping of crime-scene evidence under the custody of CPD. Defendant Smith is sued in his official capacity.

46.     Defendant Gary Gacek ("Gacek") currently serves as Chief of Police for the City of Concord and has held that position since July 2015. During that time, Defendant Gacek has been the final policymaker for CPD with respect to policing and law enforcement functions within that jurisdiction. As Chief of Police, Gacek is vested with final policymaking authority for CPD and the City of Concord with respect to maintenance, inventorying, storage, and safekeeping of crime-scene evidence under the custody of CPD. Defendant Gacek is sued in his official capacity.

47.     Unknown officers and employees of the Concord Police Department and/or others acting in concert with them, designated and as John and Jane Does 1-10, were at all times relevant to this Complaint acting under color of law and within the scope of their employment. These individuals either participated in the wrongful acts described herein or failed to prevent the violation of Long's constitutional rights. They are sued here in their individual and official capacities.

48.     At all times relevant hereto, in committing the acts and omissions herein alleged, each of the Defendants was acting within the scope of his or her employment and under color of state law.

## FACTS

### I.     Long is Wrongfully Convicted for the Rape of Sarah Grayson Bost.

#### A.     The Widow of a Former Cannon Mills Executive is Brutally Raped at her Home in Concord.

49.     At approximately 9:45 p.m. on Sunday, April 25, 1976, Sarah Grayson Bost, the 54-year-old widow of a Cannon Mills executive, was raped by a man who broke into her home. According to the prevailing theory among CPD investigators, the man had climbed up a column and entered the Bost home through an upstairs window. The column was painted white and was situated at the front corner of the residence which faced Union Street near downtown Concord.

50.     Bost was alone in her home when the man broke in and crept downstairs. The assailant, wearing a dark leather jacket, blue jeans, and a toboggan pulled low on his head, grabbed Bost as she walked to the den with her dinner in hand. The man pressed a knife to Bost's throat, threw her to the floor, and repeatedly told her not to look at his face.

51.     According to Bost's account, the man demanded money and Bost told him she would give him all she had. Bost checked her purse and noticed that $15.00 she had there was gone, leading her to believe that the man had already rifled her purse and took her money. Bost told the man she would get him money, but the man resumed his physical attack of her.

52.     The assailant beat Bost and held her face as he forced himself on her. Bost fought and scratched at the man throughout the assault and rape which continued at different parts of the ground floor of her house. She resisted his efforts to drag her upstairs to a bedroom.

13

53.     During the attack, Bost's telephone rang. She told the man she needed to answer the phone and that her friends would come over if she did not. The assailant then released her and got up. He told Bost to let him out the front door. When she did, the assailant fled. Bost ran to the back door and then to a neighbor's home. The husband, Mac Pfennell, telephoned the police while the wife, Toni Pfennell, attended to Ms. Bost.

**B.     CPD Investigators Obtain a Description of the Assailant – It Doesn't Match Ronnie Long.**

54.     Sergeant Jack Parnell ("Parnell") of the Concord Police Department ("CPD") was the first law enforcement officer to arrive at the Bost home, at 9:57 p.m. After a sweep of the residence, Parnell went to the Pfennells' home to check on Bost and to obtain a description of the assailant.

55.     The original description of the suspect consisted of the following:

> B/M, Height – 5'5" to 5'9", slender build and slim hips. Subject was plain spoken, used correct english [sic] and at times spoke very softly. No speech defect, accent or noticeable brogue evident. Subject was wearing dark, waist length leather jacket, blue jeans, with a dark toboggan pulled low on his head, could possibly been wearing gloves.

56.     This suspect description was included in Parnell's initial Case Report and provided to CPD detectives Lieutenant George Vogler and Sergeant Marshall Lee. The original description made no mention of the assailant having any facial hair.

57.     Bost was taken to Cabarrus Memorial Hospital by ambulance. Upon arrival at the emergency room, she was examined by Dr. Lance Monroe and treated for the injuries she sustained in the assault. It was noted that Bost's fingernails were "all sore" and some "had been bent backward," which Ms. Bost believed occurred while she fought and scratched at her assailant.

58. She remained hospitalized at Cabarrus Memorial Hospital, later known as NorthEast Medical Center and now as Atrium Health Cabarrus, for five days. It was noted that the victim had sustained numerous injuries during the assault, including abrasions, cuts, and bruising.

59. At the hospital, Bost was interviewed by CPD officers Sergeant David Taylor and Sergeant Marshall Lee. The description Bost provided mirrored the statement she had given to Parnell. Again, there was no mention of the attacker having facial hair.

### C. CPD Investigators Collect Trace Evidence, Fingerprints, and a Suspect Hair at the Crime-Scene.

60. CPD investigators expected to find significant forensic evidence at the Bost residence. The attack on Bost was brutal, and the two fought in separate areas of the house as the perpetrator ripped off her clothes and beat her. Investigators knew Bost's fingernails were sore and some had been "bent backward" from scratching and fighting her attacker.

61. Crime-scene investigations at the Bost residence were conducted on April 25, 26, 27, and 28, 1976. CPD Detective Van Isenhour was both the lead investigator on the case and the evidence technician. In this latter role, Isenhour was responsible for collecting, documenting, and safekeeping crime-scene evidence.

62. Isenhour took photographs at the scene and also at the hospital. He collected and marked the victim's clothing. The crime-scene was processed for latent prints of value and numerous prints, a total of 68, were lifted. Isenhour concluded that 10 could be eliminated as originating with the victim. He determined that an unspecified number of the latent lifts were of "no identification value."

63. A shoe-bottom impression was observed on a column at the left of the front steps of the house. Investigators believed the attacker made entry by climbing the column to a second-

floor landing and entering the house through an upstairs window. Isenhour obtained a latent lift of that shoe-bottom impression.

64.    Near the upstairs window believed to be the point of entry, investigators found and collected burned matches. They also obtained paint samples from the front column and carpet samples from the area where the attack occurred. A suspect hair was found in the hallway at the base of the stairs in the Bost home. Isenhour collected and bagged the "suspect hair," noting that the hair appeared to be "human in origin."

**D.    CPD Investigators Obtain Rape Kit Evidence from the Hospital.**

65.    On the night of Bost's admission to Cabarrus Memorial Hospital, staff collected numerous items of biological evidence, including pubic hair combings and five samples of bodily fluid suspected of containing sperm of the perpetrator, which were taken "according to the rape protocol."

66.    About three hours after the rape, at 12:35 a.m. on April 26, 1976, CPD officer Lee took custody of two specimens collected at Cabarrus Memorial Hospital: (1) a plastic bag containing combings of the pubic hair of the victim; and (2) a test tube containing vaginal swabs and secretions. Thereafter, Lee delivered this sexual assault evidence kit to Isenhour and Taylor.

67.    At some unknown point, CPD investigators disassembled the sexual assault evidence kit they retrieved from the hospital. The plastic bag containing combings of the pubic hair of the victim would be included with other crime scene evidence submitted to the SBI Lab in Raleigh for analysis. There is no record of what was done with the rest of the sexual assault evidence kit – the biological evidence including vaginal swabs and secretions – after Lee took possession of it on behalf of CPD and delivered it to Isenhour and Taylor.

### E. With No Leads in a High-Profile Case, CPD Investigators Decide to Target Ronnie Long.

68. The victim was the widow of a long-time, high-ranking Cannon Mills executive. At the time, the livelihoods of many thousands of individuals in and around Concord were dependent, either directly or indirectly, on Cannon Mills, which was the largest towel and sheets manufacturer in the world. For much of the 20th Century, Cannon Mills actually provided financial support for local law enforcement.

69. The case garnered significant attention in Concord, both because of the heinousness of the crime and the prominent stature of the victim and her family. Race relations in Concord were fraught, only adding to the notoriety of the case. The victim was a wealthy white woman, well-known and liked among those with whom she associated in Concord.

70. CPD was under intense pressure to make an arrest. Cannon Mills posted a $10,000 reward for any information leading to apprehension of the perpetrator. Still, days passed and CPD was no closer to solving the crime.

71. CPD investigators decided to target Ronnie Long, a young, working-class Black man, as the perpetrator, despite his innocence. A number of CPD officers were not fond of either Long or his family and they exhibited resentment and hostility toward them. The sense among some CPD officers was that Long's father, Ike, who had built a business and succeeded through hard work and determination, was too headstrong and prideful. Ike Long and his family were considered to be uppity by a number of officers with CPD.

72. There had also been prior run-ins between Long and some CPD officers. Several officers had harassed him for no good reason, and some demonstrated personal animus toward him. Long had rebuffed an attempt by Vogler to work as a confidential informant and Long's

refusal angered Vogler and other CPD officers, including those assigned to investigate the Bost rape.

73.     With no physical evidence tying Long to the crime, detectives set about manipulating an eyewitness identification of Long as the perpetrator and building a case with him as the suspect.

74.     On April 30, 1976, CPD investigators, in bad faith, manufactured a trespass charge against Ronnie Long. They charged him with trespassing in a city park. In order to have the charge appear legitimate, CPD investigators listed the head of the Concord Parks & Recreation Commission, Ken Taylor, as the complainant. Mr. Taylor had not seen Long in a city park, trespassing, or otherwise doing anything wrong, much less criminal. Neither Ken Taylor nor anyone with the Concord Parks & Recreation Commission had uttered any complaint against Long. The trespassing charge was a product of deceitful manipulation on the part of CPD investigators.

75.     After fraudulently procuring an arrest warrant on the bogus misdemeanor trespass charge, CPD investigators arrested Long and took him to the Concord Police Station. It was noted that Long was wearing a black leather jacket and black leather gloves, a look that was common at the time among African American men in the wake of the popular movie *Shaft*.[1] At the police station, Isenhour photographed Long and fingerprinted him.

76.     The booking photographs from April 30, 1976 show Long with the moustache and beard he typically wore during that time period. The photos below accurately depict Long's appearance as of April 25, 1976 – the night Bost was raped and the night Long was with friends.

---

[1] *See* https://www.imdb.com/title/tt0067741/mediaviewer/rm2564776960 (showing film still of title character, private investigator John Shaft).



77.     CPD investigators did not believe Long had committed any offense when they arrested him on a misdemeanor trespassing charge on April 30, 1976. That criminal charge was instituted in bad faith and with malice. CPD investigators orchestrated that charge simply to require Long to appear in district court, a setting in which they could manipulate an identification of him as Bost's attacker.

78.     The officers had no probable cause to believe Long had raped Bost. He did not match the victim's initial description of her assailant – a "light-skinned . . . a yellow black man" without any mention of facial hair. The officers knew none of the crime-scene fingerprints matched him. They knew, or should have known, that Long had a solid alibi for the night of the rape and that multiple people could account for his whereabouts.

**F.      CPD Investigators Orchestrate a Faulty Identification of Long as the Perpetrator.**

79.     Taylor and Isenhour went to the victim's home on May 5, 1976, and told her she would need to appear in district court five days later for the purpose of identifying her assailant.

They told Bost that she should come to court and "sit there and to look around and see if [she] saw anybody that [she] knew, or the man that raped [her]." At the very least, CPD investigators led Bost to believe that her assailant would be one of the individuals appearing in district court.

80.     Long appeared in district court on May 10, 1976, along with his father Ike Long, to answer for the misdemeanor trespass charge. Bost, along with Taylor and Vogler, were also in court that morning. At the suggestion of Taylor and Isenhour, Bost wore a disguise – a red wig and glasses – to court. Of the approximately 35 people in the courtroom, ten to 12 were Black men.

81.     As she was instructed to do by the CPD investigators, Bost sat in court, "constantly just looking." She searched the faces in the courtroom for about an hour or an hour and a half, but did not identify Long as her assailant until the judge called him to come forward for the trespassing charge. Long, as he often did, was wearing a dark leather jacket.

82.     The judge promptly dismissed the trespassing charge when the individual that CPD investigators listed as the "complaining witness" responded to an inquiry from the judge and candidly acknowledged that he had not seen Long commit any trespassing offense.

83.     Isenhour, Taylor, Vogler, and Lee did not believe that the trespassing charge was proper. They simply needed Long in court that morning so they could have Bost identify him and thus create a justification for his arrest for the rape and assault of Bost.

84.     About fifteen to twenty minutes after the charge against Long was dismissed, Isenhour, Taylor, and Lee took Ms. Bost to the police station and showed her six to eight photographs, including one of Ronnie Long in a black leather jacket and another individual that, according to Bost, "looked like it might have been a woman." When asked whether there was "anything distinctive about the dress of any of those individuals . . . that drew [her] attention to

them, she said "it was the jacket . . . if it wasn't the jacket, it was one identical to it. It was a leather jacket."

85.     Bost would later acknowledge that Long was the only subject wearing a leather jacket and that the officers "could have" explicitly asked her to pick out Long in the photo array. By presenting a photo lineup in which Long was the only individual wearing a leather jacket – one of the only consistent details in her description of her assailant – CPD officers "marked" Long as the perpetrator. Even if they did not explicitly tell her to pick out Long, they conveyed the message that he was the individual she should identify. They reinforced the victim's understandable but mistaken identification of Long as the perpetrator.

86.     At the time CPD investigators manipulated a mistaken witness identification, they had Long's fingerprints which were taken when they arrested him on April 30, 1976, on the bogus trespass charge. Upon information and belief, Long's fingerprints had already been compared against the latent lifts from the crime-scene by Isenhour. Defendants Moore, Isenhour, Taylor, Vogler and Lee all knew that none of the crime-scene prints matched Long.

87.     At the time they orchestrated the misleading courtroom identification, CPD investigators had at their disposal the recent photographs of Long pictured at Paragraph 76. Those could have been used in a photo array, similar to the process they had used while the victim was hospitalized. There was no need nor justification for the unduly suggestive in-court identification procedure that CPD investigators employed.

G.     **CPD Investigators Lie to Long and his Family and Falsely Arrest Him for the Rape of Sarah Grayson Bost.**

88.     On the evening of May 10, 1976, and after the manipulated false identification of Long as Bost's attacker, CPD officers, including Taylor and Lee, went to the Long family home and spoke with Ronnie Long in front of his parents. The officers lied about the purpose of the visit,

telling Long and his parents that Long needed to accompany the officers to the police station to "straighten out" some issue with the trespassing charge that had been dismissed that morning.

89.     Ronnie Long's parents asked the officers if anyone should go with him and specifically asked if their son should have a lawyer present. Taylor assured them that Long would be back soon and that the young man did <u>not</u> need a lawyer. Based upon the officers' false representations, Long then voluntarily followed the CPD officers to the police station. That would be the last time Long would see his family as a free man. He drove the family car to the police station unaware that Defendants had manufactured additional and much more serious criminal charges against him.

90.     At the police station, Taylor, Vogler and Lee questioned Long about the Bost rape and Long truthfully proclaimed his innocence. The officers told Long to empty his pockets. When he did so, Vogler grabbed the keys and left the room to search the Long family car with Taylor. Long, who was not under arrest at that point, was never told of his constitutional right to refuse consent to a search of the family car. At no point did Long consent to the search.

91.     Vogler and Taylor searched the car and seized a pair of leather driving gloves and five matchbooks. They claimed to find a green toboggan under the driver's seat but Long has always truthfully asserted that the hat is not his. The officers also seized the black leather jacket Long wore to the police station and obtained inked impressions of the shoes he was wearing.

92.     Long was then taken before a magistrate and, based upon the false evidence presented, he was arrested for first-degree burglary and first-degree rape. Officer Taylor was the sole witness before the magistrate. When Long was indicted by the grand jury a week later, on May 17, 1976, Taylor once again was the sole witness.

**H.  SBI Analysis Confirms that no Physical Evidence Ties Long to the Victim or the Crime-Scene.**

Isenhour Takes 15 Items of Evidence to the SBI Lab.

93.     On May 11, 1976, Defendant Isenhour drove 15 items of evidence – items collected from the victim and at the crime-scene, as well as items taken from Long, and part of the sexual assault evidence kit that CPD investigators had disassembled – to the SBI Lab in Raleigh. Isenhour left the following with the SBI for analysis:

- Ronnie Long's jacket and gloves;

- The green toboggan Vogler and Taylor claimed to find in the Long family car;

- Head and pubic hair samples from Ronnie Long;

- Carpet fibers and paint samples obtained at the Bost home;

- Known pubic hair samples from the victim (obtained from the disassembled sexual assault evidence kit);

- Five matchbooks seized from the Long family car, as well as partially burned matches found at the crime-scene;

- The victim's clothing; and

- A suspect hair collected at the site of the assault in the Bost home.

94.     Defendant Isenhour, with the knowledge, assent, and condonation of the other CPD investigators involved in the case, prepared two inconsistent versions of an evidence summary. Neither version was shared with prosecutors or Long's defense team.

95.     An evidence summary, when one is prepared, is intended to document crime-scene evidence collected and investigatory steps undertaken. It should accurately memorialize the actions of investigators and the items of evidence they collected. It is not yet known why Isenhour

would have prepared two wholly inconsistent versions of an evidence summary for the Bost rape investigation.

96.     A five-page version of the evidence summary which Isenhour signed and dated "5-12-76" references all items of evidence submitted to the SBI for analysis (attached as Exhibit A). A two-page version of the evidence summary (attached as Exhibit B) only references submission of the latent shoe-bottom impression and inked impressions of Long's shoes.

97.     Roughly a week after leaving the evidence at the SBI Lab, Isenhour was notified that SBI analysts had completed their work. Isenhour then drove back to Raleigh and retrieved all evidence that had been submitted for analysis. He also received three separate SBI lab reports.

98.     The SBI reports list Isenhour as the CPD contact person and indicate that he was to be called when analysis was completed. In his two-page evidence summary, Isenhour noted that all items of evidence (only the shoe evidence in this version of the summary) which were "submitted to the SBI Laboratory" in Raleigh "are now in the custody of this officer and are held for court usage." In that same version of the evidence summary, Isenhour acknowledged that "oral and written results were obtained."

99.     The items delivered to the SBI by Isenhour were examined by three separate analysists, and each analyst produced his own report. None of the forensic examinations connected Long to the crime.

                    The SBI Lab Reports Fail to Link Long to the Crime.

100.    SBI Special Agent Glen Glesne ("Glesne") conducted microscopic hair analysis of the following: (#4) known head hair sample from Ronnie Long; (#5) known pubic hair sample of Ronnie Long; (#9) one plastic bag containing a suspect hair found at the crime-scene; (#10) known

pubic hair collected from the victim; and (#13) a plastic bag containing clothes of the victim at the time of the rape.

101. SBI Agent Glesne concluded that the suspect hair collected at the crime-scene did not originate from Ronnie Long. He also determined that no hair or hair fragments that could have originated from Long were found on the victim's clothing. The lab report prepared by Agent Glesne states the following:

> Microscopic examination and comparison of the hair found at the scene in Item #9 showed it to be different from the suspect's hair in Items #4 and #5.

> No hair or hair fragments similar to the suspect's were found in the victim's clothing in Item #13.

102. Agent Glesne's handwritten bench notes contained the observation that the suspect hair CPD officers collected was "different from [Ronnie Long's] hair." The hair had been found at the site of the rape – in the hallway near the foot of the stairs, where Bost fought being dragged to an upstairs bedroom. Glesne noted that the suspect hair was "very heavily pigmented with a reddish sheen." He opined that the suspect hair "may be negroid or . . . (Mongolian)."

103. In sum, Glesne concluded: (i) no hairs originating with Ronnie Long were present on the victim's clothing; (ii) a suspect hair collected at the crime-scene had a reddish sheen to it and may have been "negroid or Mongolian"; and (iii) the suspect hair did not originate from Long.

104. SBI Agent Dennis Mooney ("Mooney") compared two inked shoe impressions taken from Long's shoes that he wore to the police station on the day of his arrest with the partial latent shoe track impression lifted from the column at the Bost residence. After he was taken into custody on May 10, 1976, Long's shoes were seized and photographed. His shoes, pictured below, were suede Bucks, a loafer-type shoe that was popular at the time.





105.    While Agent Mooney reported that Long's shoes "could have made the shoe track impression" from the crime-scene, "there were an insufficient number of distinct characteristics noted by which to effect any identification."

106.    SBI Agent Rick Cone ("Cone") examined Long's jacket and gloves and the toboggan that CPD officers claimed to have seized from the Long family car. Cone analyzed those items for the presence of any paint or carpet fibers from the Bost home and found none.

107.    Agent Cone also compared the partially burned matches found at the crime-scene with the five matchbooks seized from the Long family car. He eliminated four matchbooks as the

possible origin because of differences in color. With respect to the final matchbook, Agent Cone concluded that the matches found at the crime-scene "probably did not originate from that book."

108.    In sum, Cone concluded: (i) no paint or carpet fibers from the Bost home were present on Long's clothes, and that the absence suggested that those clothes probably had not been worn by the perpetrator; (ii) four of the five matchbooks seized from the Long family car were definitively excluded as the possible origin of the crime-scene matches; and (iii) the matches "probably did not originate from" the fifth and final matchbook in the Long family car.

I.    **CPD Investigators Conceal All Evidence That is Favorable to Long.**

109.    At some point after completion of the SBI lab reports on May 19, 1976, Detective Isenhour retrieved from the SBI all 15 items of evidence that he had taken there for analysis. In addition to the items of evidence, Isenhour received the three SBI lab reports prepared by Agents Glesne, Cone, and Mooney.

110.    Isenhour was aware that the SBI reports were favorable to the defense and that the prosecution team would be obligated to share those reports with Long and his trial team. Instead of honoring his obligations as a sworn law enforcement officer, Defendant Isenhour, together with Defendants Taylor, Vogler, and Lee embarked upon an illicit scheme to hide all favorable evidence from prosecutors and Long's attorneys. Because these Defendants never provided the SBI lab reports to prosecutors, District Attorney ("DA") Bob Roberts could not fulfill his obligations under Brady v. Maryland, 373 U.S. 83 (1963), and make the materials available to Long's defense team.

Isenhour Prepares Two Versions of Evidence Summaries but Shares Neither with Prosecutors.

111.    It is not yet known why Defendant Isenhour prepared two contradictory lists of crime-scene evidence. Regardless, neither version of Isenhour's evidence summary was provided to the DA or to Long's trial team.

112.    The five-page summary (Exh. A) lists all 15 items of evidence Defendant Isenhour actually took to the SBI for analysis. The two-page summary (Exh. B) sets forth the limited amount of evidence – the latent shoe-bottom lift from the column and the inked impressions of Long's shoes – that Defendant Isenhour would later tell a jury compromised the entirety of forensic evidence collected.

113.    Long's trial team was unaware of the existence of either evidence summary at the time of trial. Thus, they did not know, and could not have known, of the extent of efforts undertaken by CPD to fabricate some link between Long and the crime. When the forensic evidence demonstrated that Long was not the perpetrator, CPD investigators buried the test results and even the fact that the evidence had been collected and submitted for scientific analysis.

The SBI Lab Reports are not Provided to Prosecutors.

114.    Defendant Isenhour took possession of the three SBI lab reports when he retrieved the 15 items of evidence from the SBI Lab in Raleigh approximately one week after he had left the evidence there. According to Isenhour, Defendant Taylor accompanied him on the trip to Raleigh to retrieve the items of evidence. At trial, Defendant Taylor testified that every officer involved in the case knew what evidence had been collected and what evidence CPD had in its possession.[2]

115.    Defendants Isenhour, Taylor, Lee, and Vogler were the CPD officers primarily responsible for the investigation of the Bost rape and the false charges asserted against Long. These Defendants were all aware of the SBI lab reports and the fact that they demonstrated there was no link between Long and the crime. Collectively, they undertook an unlawful scheme to withhold exculpatory and impeachment evidence.

---

[2] Tr. of Trial, State v. Long, Vol. II, p. 245, 76-CRS-5708, 76-CRS-5709 (hereafter "Trial Tr.").

116.    These Defendants did not inform the Cabarrus DA that SBI lab reports had been obtained because they knew Bob Roberts, as DA, adhered to a policy of "open file" discovery and would have made the SBI lab reports available to Long's defense team.

117.    Because these Defendants concealed the SBI lab reports from prosecutors, Long's trial team never learned about those reports and the critical exculpatory and impeachment evidence contained therein.

Fingerprints at the Crime-Scene are Hidden and not Reported.

118.    CPD investigators undertook an extensive search for fingerprints left by the perpetrator. Sixty-eight (68) latent lifts were obtained. None matched Ronnie Long.

119.    Defendants Isenhour, Taylor, Vogler, and Lee never informed the DA that numerous latent lifts at the crime-scene had been obtained and that none matched Long. Because Defendants concealed this information from prosecutors, Long's defense team never learned that a search for suspect prints had been undertaken and that no crime-scene fingerprints matched Long.

Rape Kit Evidence is Concealed and then Destroyed.

120.    As detailed above, sexual assault evidence was obtained from the victim at Cabarrus Memorial Hospital. The evidence consisted of combed pubic hair in a plastic bag and a test tube with vaginal swabs and secretions. This evidence was released by Cabarrus Memorial Hospital to Defendant Lee at 12:35 a.m. on April 26, 1976. Upon information and belief, Defendant Taylor accompanied Lee to retrieve the sexual assault evidence from Cabarrus Memorial Hospital. Thereafter, Defendants Isenhour and Taylor maintained custody of the evidence while it was under CPD control.

121.    The sexual assault evidence kit had obvious and apparent evidentiary value and Defendants had actual knowledge of this critical fact. Even in 1976 and before the advent of DNA

testing, the sexual assault evidence could have excluded Long as the perpetrator. Once DNA was regularly used in North Carolina, in the early 1990s, the sexual assault evidence could have identified the actual perpetrator of the Bost rape and/or could have proved Long's innocence.

122.     It is not yet known precisely what Defendants did with the sexual assault evidence once Defendants Isenhour and Taylor took possession of it on April 26, 1976. It is clear that Defendant Isenhour and/or Defendant Taylor consciously disassembled the evidence kit and that Isenhour submitted a portion of the evidence – the plastic bag containing combings of the victim's pubic hair – to the SBI Lab in Raleigh, where an analyst determined that no hairs or hair fragments of Long were present. It is also clear that the hair evidence was retrieved by Isenhour from the SBI Lab. Yet no further record of disposition or destruction of the hair evidence has ever been produced.

123.     No documentary evidence or sworn testimony has revealed what Defendants did with the remainder of the sexual assault evidence kit – the biological evidence consisting of vaginal swabs and secretions – after they retrieved it from Cabarrus Memorial Hospital and proceeded to disassemble the evidence kit.

124.     Upon information and belief, Defendants Isenhour and Taylor, acting in concert with Defendants Lee and Vogler, destroyed the entirety of the sexual assault evidence – both the biological evidence, consisting of the test tube with vaginal swabs and secretions, and the plastic bag of victim pubic hair combings – in bad faith and with malice.

125.     Defendants knew that analysis of the pubic hair combings was exculpatory and hid that fact from prosecutors and Long's defense team. With respect to the biological evidence, which included samples of the perpetrator's semen, it is not yet known whether Defendants destroyed this evidence because they had it tested and thus possessed actual knowledge that it did not

implicate Long or whether they destroyed the evidence prior to having it tested because they knew it would not be inculpatory. In any event, all portions of the sexual assault evidence were last under the custody and control of Defendants, and, upon information and belief, were intentionally destroyed by them.

126.     Defendants' destruction of the sexual assault evidence was done in bad faith and maliciously and with the intent that the destruction of evidence cause harm to Ronnie Long. Defendants took affirmative steps to conceal their wrongful actions in destroying critical evidence which they knew would demonstrate Long's innocence.

127.     Defendants never disclosed to the DA that sexual assault evidence had been collected and that CPD had taken possession of same. Because Defendants concealed the sexual assault evidence from prosecutors and thereafter destroyed it in bad faith, Long's trial team never learned about this critical evidence.

<u>Investigation of Alternative Suspects is not Revealed to Prosecutors</u>.

128.     Defendants Isenhour, Taylor, Vogler, and Lee also concealed the fact that other individuals had been considered "alternate suspects" in the Bost rape. The more complete Isenhour evidence summary suggests that the latent fingerprint lifts were compared to prints of someone other than Ronnie Long, but that is not clear. To this day, Defendants have failed and refused to identify how, why, or when other individuals were designated as "alternate suspects."

129.     The fact that CPD investigators considered other individuals to be "alternate suspects" constitutes <u>Brady</u> material that prosecutors would have been obligated to share with Long's defense team. Because they knew of DA Bob Roberts' "open file" discovery policy and that the DA would have shared information about alternative suspects with Long's defense team, CPD investigators unlawfully withheld this exculpatory and impeachment evidence.

130. CPD investigators, including Defendants Isenhour, Taylor, Vogler, and Lee did not report to the DA that there were "alternate suspects." Because Defendants concealed the fact of alternative suspects from prosecutors, Long's defense team never learned the identity of any other suspects and why investigators thought they may have committed the Bost rape.

**J. Ronnie Long is Subjected to Trial in an Explosive, Racially-Charged Atmosphere.**

131. Ronnie Long's arrest polarized the community in and around Concord. Marches and demonstrations were held throughout the summer of Long's arrest.

132. Long retained the highly-regarded Chambers Firm to represent him. James Fuller served as lead counsel and was assisted by Karl Adkins and Yvonne Mims. Les Burns was the trial team's investigator.

133. Prior to trial, DA Bob Roberts met with Long's trial team, in June 1976, and provided them with all of the investigative materials that Roberts had received from CPD investigators. Roberts and Assistant District Attorney Ron Bowers ("Bowers") were unaware of the extensive exculpatory and impeachment evidence which had been obtained and then unlawfully withheld by CPD investigators.

134. Nothing put either the prosecutors or Long's defense team on notice that CPD investigators had withheld exculpatory and impeachment evidence from them.

135. The atmosphere at the 1976 trial was tense and racially-charged: "white folks were on the prosecutor's side and the black folks with a few, sort of a salt and pepper sprinkling of whites" on the defense side.[3] Because of the racial tensions surrounding the case and its high-profile nature, Long's attorneys considered moving for a change of venue. They ultimately decided

---

[3] Tr. of Hr'g on Def.'s Mot. for Appropriate Relief at 19, <u>State v. Long</u>, 76-CRS-5708, 76-CRS-5709 (Dec. 16, 1987) (testimony of James Fuller).

against such a motion because of significant Ku Klux Klan activity in counties surrounding Cabarrus County.

136. The jurors were all white, and four had connections to Cannon Mills, a company that for decades had been the most important corporate presence and employer in Concord and surrounding areas. The victim had worked at Cannon Mills for twenty-one years. Her deceased husband, Eugene Gray Bost, was Treasurer of Cannon Mills, and his name appeared on employees' paychecks. Three of Long's jurors worked for Cannon Mills, and a fourth was married to a Cannon Mills employee.

137. The all-white jurors were selected from a jury pool that was personally vetted by the Cabarrus County Sheriff, along with the Chief of Police for the City of Concord and currently unidentified CPD officers – all before anyone on the list was issued a summons for service. The county's Jury Commission Chairman explained the process as follows:

> [He] takes the [jury] roll lists to the Sheriff's department and sometimes the sheriff comes to our office on Church Street, and go over name by name and he knows most of them personally, but sometimes he also brings a couple of deputies with him; and they in turn help him check the names off of the ones who are supposed to be disqualified, or the same thing is done in the CPD . . . and that's the way we disqualify these people who are not eligible to be on the jury.[4]

138. No record of the reason for any jury disqualifications was maintained, though the Cabarrus County Sheriff testified that he struck through a couple dozen or more names. Likewise, there was no record of how many prospective jurors were struck by other law enforcement officers, including the CPD Chief of Police and his subordinates. The process employed by the Sheriff and the CPD Chief and their officers in which they would simply strike through names with no independent inquiry of the names disqualified by law enforcement was described as a means of

---

[4] Trial Tr. Vol. I, pp. 20-21 (voir dire testimony of John Robinson, Jr.).

Case 5:21-cv-00201-D   Document 1   Filed 05/03/21   Page 33 of 88

removing "undesirables" from the jury roll. Of the ninety-nine prospective jurors called for potential service on Ronnie Long's jury, four were African-American.

139. Racial tensions persisted throughout the trial as a young Black man was tried for his life even though multiple witnesses – who all happened to be Black – could account for Long's whereabouts at all times on the night of the rape. Marches and protests continued during the week of trial and the National Guard was placed on standby.

**K.    CPD Investigators Continue to Conceal Evidence and Testify Falsely at Trial.**

140. Critical pieces of evidence were withheld from Ronnie Long and his trial team. The evidence discussed above, all having either exculpatory or impeachment value, was suppressed and wrongfully withheld from prosecutors and from Long's defense team.

141. In addition to withholding key pieces of evidence and the fact of its analysis, Defendants Isenhour, Taylor, and Vogler also presented false testimony to the judge and jury deciding Ronnie Long's fate. Their false testimony was not the result of mistake, confusion, or faulty memory. It was intentional and malicious. They lied.

142. Defendant Isenhour testified that the "latent evidence" he collected consisted of the shoe-bottom print on the column. In actuality, he collected some 68 latent lifts, compared them to Long, and concluded that no fingerprints at the crime-scene matched Long. The jury never learned that latent lifts had been collected and that no crime-scene fingerprints matched Long.

143. Defendant Isenhour testified that he transported the latent lift of the shoe-bottom print from the column and the inked impressions of Long's shoes to the SBI for testing, that those items remained in his possession while tested, and that he then returned to CPD with the evidence. In actuality, he left the evidence with the SBI and, accompanied by Taylor, retrieved it

approximately one week later. Notations in the SBI documentation specify that Detective Isenhour was to be called when testing was "completed and he will pick up evidence."

144.    At trial, Defendant Isenhour was twice asked if he had ever relinquished possession and control of the shoe-bottom impression evidence and Isenhour responded in the negative both times: "it has not" and "no."

145.    Defendant Isenhour also falsely testified that Long's clothes never left his possession. In fact, Isenhour had taken those items – Long's gloves and jacket, and the green toboggan CPD officers claimed to have found in the Long family car – to the SBI.

146.    At trial, Defendant Isenhour provided the following false testimony about whether the latent shoe print impression had ever left his possession:

Q:    Has (the latent footprint) ever been out of your possession and control since you took it?

A:    It has not.

Q:    Did you take it anywhere for comparison with any other print of a shoe?

A:    I did.

Q:    And what date did you take it?

A:    May the eleventh.

Q:    Where did you take it?

A:    To the State Bureau of Investigation Laboratory, Latent Evidence Section in Raleigh.

Q:    While that comparison was made, did it leave your possession and control?

A:    It did not.

Q:    And what did you do with it once the comparison was made?

A:    It's been under my custody and control.

Q:    So that latent lift has never left your custody and control since you took the lift from the porch, is that correct?

A:      It has not.[5]

147.    Isenhour testified falsely in claiming that the clothes taken from Ronnie Long never left his custody:

Q:      What did you receive?

A:      I received a black leather-type coat from Sgt. David Taylor. I received a green cloth toboggan from Sgt. Taylor, I received a pair of black gloves from Sgt. Taylor. I received a quantity of matchbooks from Sgt. Taylor.

Q:      I hand you, now, sir, and a leather jacket marked for identification as State's Exhibit Number Seven, and ask you if you can identify that sir?

A:      I can.

Q:      What is that?

A:      It's the black jacket that I received from Sgt. David Taylor.

Q:      Where has it been since you received it?

A:      It's been in my custody and control.[6]

148.    Sergeant David Taylor also committed perjury at trial in hiding the fact that the SBI had compared the matches found at the crime-scene to matchbooks seized from the Long family car. Taylor's false testimony on that point consisted of the following:

Q:      Why were the match box covers received?

A:      It was physical evidence we obtained from the scene to match with the matches we got out of the car.

Q:      Could you explain that, I didn't . . .

A:      We obtained some matches from the scene of the crime. Some matches that had been struck and lit, and we took matches of similar nature from his vehicle.

Q:      What kind of matches did you find?

A:      They were just paper matches.

---

[5] Trial Tr. Vol. II, p. 265.
[6] Trial Tr. Vol. II, p. 289.

Q:     Did they match?

A:     I didn't match them, no, sir.

Q:     Then they were not matched?

A:     To my knowledge, they were not matched.

Q:     In other words, the matches you got out of the car do not match with those found at the scene of the crime?

Mr. Bowers:   Objection.

Court: Overruled.

A:     I can't testify to that.

Court: Do you have any information that they didn't match?

A:     No, sir, they didn't match.[7]

149.    Even when the trial judge sought clarification as to whether there had been any attempt to compare the crime-scene matches to the matchbooks seized from the Long family car, Taylor provided false testimony. Taylor knew that an attempt "to match" the items had been made by a trained SBI analyst and that the matches were from a different source. A truthful response to the trial judge's query would have included facts clearly within Taylor's knowledge – an SBI analyst had in fact made a comparison and concluded that the seized matchbooks were not the source of the crime-scene matches.

150.    Defendant Taylor further provided false testimony when he testified that the victim's initial description of her assailant included the man having facial hair. Taylor told the jury from the witness stand: "She stated he had a moustache and the way she described it that night was spots of hair on the side of his face and maybe a beard."[8] In actuality, the victim's initial descriptions of her assailant contained no mention of any facial hair. The victim's description of her assailant changed over time, as she met with CPD investigators. But rather than acknowledge

_____

[7] Trial Tr. Vol. II, pp. 208–09.
[8] Trial Tr. Vol. II, p. 179.

that fact, Defendant Taylor improperly bolstered her mistaken identification by falsely attesting to the consistency of her description of the man who had raped her.

151.    Defendants Isenhour and Vogler likewise provided false testimony and characterized the matches found at the crime-scene as "of a similar nature" and the "same type of match" as the matchbooks found in the Long family car. In actuality, Defendants knew that the SBI had concluded that four of the matchbooks in the car could not have been the source of the crime-scene matches and that those matches "probably did not" originate from the fifth and final matchbook seized from the car.

**L.      Because Defendants Conceal Exculpatory and Impeachment Evidence and Deny Long a Fair Trial, He is Wrongfully Convicted.**

152.    At trial, the victim continued to operate under her mistaken belief that Long was the man who had raped her. At that point, CPD investigators had orchestrated an unreasonably suggestive identification procedure in which Bost identified Long in a courtroom setting and then reinforced her mistaken identification by showing her a misleading photo array in which Long was the only one wearing a jacket and thus "marked" as the perpetrator.

153.    Because the individual Defendants had concealed every bit of exculpatory or impeachment evidence which could have been used to undermine the victim's mistaken witness identification, Long's defense team had little evidence with which to attack the identification which was, for all intents and purposes, the entirety of the prosecution case.

154.    As the Fourth Circuit Court of Appeals would later note in its *en banc* opinion holding that Long's constitutional rights were violated by virtue of the multiple <u>Brady</u> violations committed by CPD investigators:

> Indeed, the State's conduct in suppressing the forensic test results likely caused Ms. Bost's identification to carry more weight with the jury than it deserved, since there was zero forensic evidence to contradict it. In reality,

every bit of forensic evidence in this case at worst directly contradicted Ms. Bost's purported identification and, at best, failed to support it.

Long v. Hooks, 972 F.3d 442, 465 (4th Cir. 2020).

155. Without the mistaken witness identification, the prosecution case was weak. Long had a black leather jacket and black driving gloves – items of clothing that were common among Black men at the time. His shoes, also a popular style, had the same class of tread as a shoe that had left a shoe print impression at the Bost home at some point in time prior to the rape. Because the prosecution case was so weak, CPD investigators had to suppress every bit of evidence which would have cast doubt on the victim's identification of Long. They did so, and the result was a shockingly unfair trial.

156. Long's defense attorneys were experienced and highly-regarded. All three would later become judges. They presented a compelling case but were hamstrung by all that was hidden from them. As Jim Fuller would testify later, the SBI lab reports that were suppressed by CPD investigators would have made "all the difference in the world."

157. Defense counsel argued that Long's leather jacket did not appear to have any white paint from the column of Bost's home on it, but they could present no evidence of that fact. They could not show the jury that a trained SBI analyst had examined the jacket and concluded that no microscopic paint or carpet fibers were to be found on any of Long's clothing.

158. Without the exculpatory SBI lab reports, Long's attorneys were unable to show the jury that the forensic evidence undercut the identification and pointed to Long's innocence. They could not show the jury that no crime-scene fingerprints were matched to Long or that a sexual assault evidence kit had been hidden by investigators.

159. Long's attorneys put on an alibi defense and numerous witnesses vouched for Long's whereabouts on the evening of the Bost rape. At the time of the rape, Long was at home

and, along with his mother, spoke by telephone with Long's girlfriend and their toddler son. Long was waiting for his father to return with the family car so he could go to a party in Charlotte. Earlier that evening, he was with friends planning a high school reunion party.

160.    Witnesses who saw Long later that evening testified that he had no cuts or abrasions on his face or body. His demeanor was normal. Long was noted to be wearing khaki pants, not jeans like the man who raped Bost. A friend, Kenneth Byers, kidded him about the khakis.

161.    In closing arguments, the prosecutor implored the jury to place their faith in the law enforcement officers who investigated the rape. He vouched for the "perfect honesty" and integrity of those law enforcement officers, completely unaware of their bad faith actions taken to hide exculpatory and favorable evidence from the defense.

162.    At closing, the State made the following arguments:

> Every word [the victim] uttered is fully and entirely corroborated by the evidence as was seen by the officers in her home . . . and the latent evidence found by the officers.
>
> . . .
>
> The man that made that footprint is the man that broke into her home.
>
> . . .
>
> The victim's testimony is not only accurate, but totally consistent with every piece of physical evidence existent. Everything she says happened that is capable of being corroborated by the physical evidence, corroboration, is so corroborated … every piece of physical evidence points unerringly to the fact that [the victim] told you exactly what happened that night unerringly.

163.    As the Fourth Circuit noted:

> [I]f the SBI reports had not been suppressed, the prosecutor would not have been able to vouch for the officers in his closing argument that Ms. Bost's identification was "totally consistent with every piece of physical evidence existent." Nor could he opine as to the officers' "perfect honesty."
>
> Long v. Hooks, 972 F.3d at 463.

164.     The fact that Defendants suppressed every bit of forensic evidence that undercut the victim's faulty identification of Long allowed the prosecutor to unwittingly make forceful arguments supportive of the case the CPD investigators had manufactured. It also gave the jury license to disregard the fact "that Ms. Bost's description of the perpetrator (1) did not match [Long]; and (2) changed over time." Long v. Hooks, 972 F.3d at 467.

165.     The jury, presented with a case that had been orchestrated and manufactured by Defendants Isenhour, Taylor, Vogler, and Lee, erroneously credited the victim's mistaken identification and found Long guilty of first-degree burglary and first-degree rape. He was sentenced to two terms of life imprisonment.

166.     At the time of his indictment, the crime of first-degree rape carried a mandatory death sentence; the crime of first-degree burglary called for a mandatory life sentence. On July 2, 1976 – just three months before Long's trial – the United States Supreme Court held that the state's capital punishment statute was unconstitutional, and the sentence became life in prison. Woodson v. North Carolina, 428 U.S. 280 (1976). Because of the mandatory death sentence at the time he was indicted, Long's direct appeal was to the North Carolina Supreme Court, which affirmed his convictions. State v. Long, 293 N.C. 286, 237 S.E.2d 728 (1977).

II.     **Long's Efforts to Prove His Innocence are Obstructed by Defendants.**

167.     Following his wrongful conviction and incarceration, Long continued to proclaim his innocence and fight for his freedom. Just as he had refused to consider a plea deal prior to trial because that would require admitting guilt to something he had not done, Long refused to participate in sex offender classes during his incarceration. Even though such steps might have increased his chances of obtaining parole, Long would not acknowledge guilt for a crime of which he was innocent.

168.    Long refused to be labeled a "sex offender" and remained committed to proving his innocence. He wanted to clear his name and that of his family. Long knew how his family had suffered because of the wrongful conviction that had smeared the good standing in the community that the family had earned and once enjoyed.

169.    Outside the prison walls, Long's friends and family continued to highlight the unfairness of his conviction, and the case received media attention in and around Concord and Charlotte. Though aware of efforts to obtain a full and fair hearing of Long's claim of innocence, the individual Defendants, the City of Concord, and CPD continued to withhold evidence which would both demonstrate Long's innocence and potentially lead authorities to apprehension of the actual perpetrator of the Bost rape.

170.    In late 2004, friends and family of Ronnie Long contacted the UNC Innocence Project and its founder, Professor Rich Rosen. The UNC Innocence Project accepted Long's case for investigation. Professor Rosen asked one of his former students, Donna Bennick ("Bennick") to take on the case and she agreed to do so. Bennick then enlisted the help of another Chapel Hill lawyer, Janine Zanin ("Zanin").

171.    In early 2005, Bennick and Zanin contacted the Cabarrus County DA's Office to advise the DA, Roxann Vaneekhoven, of their representation of Ronnie Long. On behalf of Long, his post-conviction attorneys specifically sought and requested any evidence which could be used to demonstrate Long's innocence, including but not limited to biological evidence.

172.    From early 2005 through the date of his exoneration, Defendant City of Concord, CPD, and the individual Defendants were aware of requests on behalf of Long for evidence which could be used to demonstrate his innocence. They were aware from a much earlier date of good reason to re-examine the case and acknowledge Long's persistent and truthful claims of innocence.

173.    From at least the early 1980s on, Defendant City of Concord, CPD, and Defendants Moore and Hamilton, as well as yet-to-be-identified CPD employees, were aware of serious issues with Isenhour's character generally and that he engaged in dishonest, unscrupulous, and unlawful acts on a regular basis. By the mid-1980s, Isenhour had a criminal record which included multiple convictions for theft and forgery crimes. At the time of his arrest on federal theft offenses, Isenhour was living under the alias of "Ross R. Clark" in Savannah, Georgia and had committed multiple crimes of dishonesty in several states. On October 2, 1987, Isenhour pled guilty to federal charges related to possession of stolen U.S. Treasury checks and was sentenced to federal prison.

174.    Upon information and belief, officials with the City of Concord and various Chiefs of Police for CPD were on notice of misconduct on the part of Isenhour, both during the performance of his duties in the Long criminal investigation and through other instances of dishonest and unlawful acts during his employment with CPD. Though aware of Isenhour's pattern of dishonest conduct, including during his tenure as a CPD officer, these Defendants failed and refused to either divulge information concerning Isenhour's misconduct or to undertake any assessment of the integrity of investigations in which Isenhour had been the lead investigator or a critical witness.

175.    The City of Concord, during the pendency of Long's 1986 and 2008 Motions for Appropriate Relief, knew that the lead investigator in Ronnie Long's case was a convicted felon who was living under an alias at the time of his arrest on crimes involving dishonesty. No action was taken by the City of Concord or any CPD Chief of Police to investigate Long's persistent and supported claims of innocence. Instead, the City of Concord and its agents and officials continued to obstruct justice and to deny Long meaningful access to the courts so that he could at long last prove his innocence.

176. Defendants have engaged in a decades-long campaign to hide both the facts demonstrating Long's innocence and their own misconduct. They have obstructed justice at every turn. To this day, the City of Concord and CPD have failed and refused to make an honest account of crime-scene evidence collected in 1976. Evidence and documentation related to same that remains under Defendants' custody could shed light on why Ronnie Long spent 44 years in prison as an innocent man and, conceivably, could identify the individual who actually assaulted Sarah Grayson Bost.

**A.    A May 23, 2005 Evidence Order Requires the Location and Preservation of All Evidence Obtained in the Underlying Criminal Investigation.**

177. In April 2005, Long's post-conviction attorneys, Bennick and Zanin, sought the location and preservation of any evidence obtained in the criminal investigation, as well as DNA testing of any items suitable for DNA testing, through motions filed in Cabarrus County Superior Court. On May 23, 2005, the Honorable W. Erwin Spainhour signed an Order on Motion to Locate and Preserve Evidence ("2005 Evidence Order").

178. The 2005 Evidence Order directed the Cabarrus DA's Office, CPD, and the SBI, to locate and preserve all physical evidence collected in the underlying investigation. The DA's Office, CPD, and the SBI were directed to submit for inspection any existent evidence, as well as evidence custody records.

179. Pursuant to the 2005 Evidence Order, the Cabarrus DA's Office, CPD, and the SBI were specifically directed that those entities "shall inform defense counsel whether any physical evidence is still in their custody and shall preserve the same."

180. On June 7, 2005, Judge Spainhour issued an order directing that NorthEast Medical Center, formerly Cabarrus Memorial Hospital, locate and preserve any biological evidence in its

possession and to provide the Court a descriptive inventory of such evidence obtained as a result of the examination of the victim by Dr. Lance Monroe.

181.   A hearing on the Motion for DNA Testing was scheduled to be heard on June 16, 2005. On that morning, the SBI first responded to the 2005 Evidence Order with a letter faxed by SBI Legal Counsel John H. Watters.

182.   In the letter faxed the morning of the hearing, Watters represented that he had personally undertaken coordination of the search "for the items in question." Watters's letter stated:

> The SBI's long standing [sic] policy is that we **do not** keep evidence submitted for analysis. (We simply do not have room to be an evidence custodian for the entire State.) Even though that is the SBI's policy I requested that a search be undertaken. None of the evidence listed was found to be in the possession of the Bureau. The one possible exception to the aforementioned policy is the "rape kit" that was apparently done on the victim. I have asked the SBI's laboratory personnel to search under the name of Ronnie Wallace Long and the name of the victim. (I was able to get the victims [sic] name from the case citation in your Order.) The name mentioned in the Supreme Court Reporter is Mrs. Gray Bost. A search was conducted under that name and no "rape kit" was discovered.

183.   No documents or materials were produced or identified by CPD or the then-serving Cabarrus DA, Roxann Vaneekhoven. The efforts purportedly undertaken to locate evidence or files under the custody of CPD were addressed by DA Vaneekhoven and a CPD evidence technician, Sgt. Robert Ledwell.

184.   DA Vaneekhoven made the following representation at the hearing:

> We . . . requested that the Concord Police Department do a thorough search of all their evidence and the inventory they have. . . . I know that based on the work that [Ledwell]'s done, there have been at least 25 man hours spent searching for any of the items outlined in the Court's order . . . anything that may not have been introduced into court at the actual trial and they have found nothing.

185.     Sgt. Robert Ledwell testified: "Really, the only thing I was able to locate was the case file." In response to questions at the hearing, Ledwell stated that only paperwork had been found. He stated: "No, sir, no physical [evidence] . . . No, sir, no evidence sheets." Ledwell noted that, in searching for old evidence, he found a spiral notebook with various files in it, including one he termed a "master investigation file."

186.     Sergeant Ledwell also testified that he had spoken with CPD officers involved in the underlying investigation of the Bost rape, including Defendants Taylor and Vogler. Though they were aware of Long's claim of innocence and the purpose of the June 16, 2005, hearing, neither Taylor nor Vogler provided Ledwell any information about the evidence they hid and destroyed 29 years earlier.

187.     At the time of the June 16, 2005, hearing, evidence suitable for DNA analysis was under CPD custody. Specifically, there were three envelopes containing latent lifts from the crime-scene. The latent lifts could have been compared to a national or state offender database, but CPD did not produce the latent lifts in response to the 2005 Evidence Order. Three of the crime-scene latent lifts were "DNA candidate prints" and could have been subjected to DNA analysis. CPD produced no evidence, materials, or documents in response to the 2005 Evidence Order. Instead, Defendants asserted that nothing of "evidentiary value" could be located under the custody or control of CPD and the City of Concord.

188.     Notwithstanding Defendants' assertions that nothing of significance from the case remained, at the conclusion of the June 16, 2005, hearing, Bennick and Zanin requested permission to examine the master case file Sergeant Ledwell had mentioned. Judge Spainhour granted that request and, thereafter, Long's attorneys sought to review the CPD file.

189. On July 12, 2005, Judge Spainhour transmitted to Long's post-conviction counsel eleven redacted pages related to the victim's post-rape hospitalization at Cabarrus Memorial Hospital. The records documented the injuries sustained by the victim ("the patients [sic] fingernails are all sore and some of them have been bent backward which the patient thinks occurred when she was trying to scratch her assailant in fighting back") and the fact that combings of the victim's pubic hair and swabs and secretions were collected "according to the rape protocol."

190. The records included an Authorization for Release of Rape Information, Specimens, and Photographs signed by CPD Sergeant Marshall Lee at 12:35 a.m. on April 26, 1976. That form documented the release to CPD of biological evidence from the victim, specifically "combed pubic hair in plastic bag" and "1 test tube with vaginal swabs and secretions."

191. Thus, in July 2005, attorneys for Long first learned that biological evidence had been obtained from the victim on the night of her rape.

**B. Long's Attorneys Discover the Isenhour Evidence Summaries in August 2005.**

192. In early August 2005, Long's post-conviction counsel, Bennick and Zanin, were first permitted the opportunity to review the CPD investigative file which Sergeant Ledwell referenced in his June 16, 2005, testimony. That file contained two versions of evidence summaries prepared by Defendant Isenhour. Each evidence summary purported to document the evidence collected in connection with the case and transported to the SBI for analysis.

193. The Isenhour evidence summaries referenced the SBI involvement in the case, though the SBI lab reports were no longer in the CPD investigative file. The evidence summaries also listed additional items which were no longer in the CPD investigative file, including latent print sheets, photographs of the crime-scene, photographs of the victim, and other items such as the victim's clothing purportedly locked for evidence security.

47

**C. The City of Concord and CPD Fail to Produce the SBI Lab Reports and Other Evidence in Response to the Preservation Order.**

194. Once Long's attorneys learned that Isenhour had taken numerous items of evidence to the SBI Lab, they set about trying to locate those reports and any remaining evidence. As part of that effort, Donna Bennick wrote DA Vaneekhoven on August 11, 2005, to ask whether the Cabarrus DA's Office had any such reports or evidence.

195. Vaneekhoven responded that she personally searched every file room controlled by the DA's Office and, other than her personal file containing correspondence and attorney notes, found only a trial transcript, a habeas petition, and a petition for a writ certiorari with attachments. DA Vaneekhoven also consulted with CPD personnel regarding the purported searches of CPD evidence and storage facilities. She asserted: "No items of evidence, test results, or reports referred to in Ms. Bennick's latest letter were located." Long's attorneys, Bennick and Zanin, made repeated inquiries of CPD and spoke with CPD evidence technician Robert Ledwell on multiple occasions, inquiring about the missing SBI lab reports and any other existent crime-scene evidence or documentation.

196. Notwithstanding John Watters's June 16, 2005, representation that he had personally undertaken a comprehensive search for any SBI records, Long's attorneys made separate inquiry of the SBI through the UNC Innocence Project's Professor Rosen. At Professor Rosen's request, Deputy Assistant Director Bill Weiss initiated a review of SBI files and within a matter of weeks had located the three previously undisclosed SBI lab reports.

197. Bill Weiss sent the three SBI lab reports to Professor Rosen on January 13, 2006. That was the first instance on which any representative of Ronnie Long received the SBI lab reports that had been prepared in May 1976 and delivered to CPD shortly thereafter.

**D. Defendants' Continued Obstructionism and Failure to Properly Maintain Crime-Scene Evidence Denies Long His Right of Access to the Courts.**

198. From the time they undertook representation of Long in early 2005, Bennick and Zanin zealously and relentlessly pursued evidence which would prove Long's wrongful conviction and his innocence. All evidence and documentation they sought should have been properly stored and maintained by the City of Concord and CPD and should have been produced upon request. However, no such evidence or documentation was ever voluntarily produced by Defendants even in response to the 2005 Evidence Order.

199. The Isenhour evidence summaries were identified by Bennick and Zanin after they insisted on laying eyes on the CPD file themselves. Their request followed multiple representations on behalf of CPD and the City of Concord that nothing from the case remained.

200. The SBI lab reports were obtained through a personal entreaty by Professor Rosen to the SBI Assistant Director and after SBI Legal Counsel John Watters had represented to the Court that nothing existed within the SBI's files.

201. Bennick and Zanin filed a Motion for Appropriate Relief ("MAR") on August 27, 2008. An evidentiary hearing was conducted on November 20, November 21, and December 2, 2008. On February 25, 2009, the Court denied Long's Brady claims.

202. On February 4, 2011, the North Carolina Supreme Court – by a three-to-three vote with one Justice abstaining – affirmed the MAR Order denying Long's Brady claims.

203. At the time Bennick and Zanin litigated Long's MAR on his Brady claims, they were unaware that yet more exculpatory evidence remained in the possession of CPD. Unbeknownst to Long's attorneys, CPD had in its possession latent lifts from the crime-scene investigation which had never been disclosed nor produced to prosecutors or Long's trial team.

Long's attorneys were also unaware that CPD investigators had suppressed the evidence of alternative suspects from prosecutors and Long's trial team.

204.    It was not until May 2016 that the full extent of misconduct on the part of CPD investigators would be brought to light. On May 26, 2016, Jamie Lau of the Duke University School of Law Wrongful Convictions Clinic filed a Petition for Habeas Corpus in the United States District Court for the Middle District of North Carolina. In that habeas petition, Lau was able to present a more complete picture of the misconduct on the part of CPD investigators which led to Long's wrongful conviction.

205.    In an opinion issued on August 24, 2020, the United States Circuit Court of Appeals for the Fourth Circuit held that Long's habeas petition was meritorious and afforded relief. That outcome would have been achieved years earlier but for the obstructionism and misconduct on the part of the City of Concord and the various Chiefs of Police who oversaw the failure of their subordinates to honor their obligations as sworn law enforcement officers and to comply with the 2005 Preservation Order.

### E.    The City of Concord and CPD Continue Practices, Policies, and Procedures that Deny Individuals Access to Crime-Scene Evidence and Brady Materials.

206.    At all times relevant to Long's criminal prosecution and wrongful incarceration, CPD has adhered to policies and practices which render it impossible for officials charged with obligations to maintain and safekeep crime-scene evidence, evidence logs, and other crime-scene documentation to be properly kept. As CPD Chief of Police Merl Hamilton candidly admitted during a May 23, 2005 WSOCTV.com interview: "Things were not categorized by computer number – just stored. So we have to hand-search and not everything was kept."

207.    At all relevant times, crime-scene evidence, evidence logs, and documentation related to same have been kept in a haphazard, disorganized manner. As a result, CPD is unable to

locate critical pieces of evidence or documentation when called upon to do so. These failures have been and remain widespread and pervasive and directly led to and/or contributed to Defendants' failure to properly account for crime-scene evidence and documentation which directly bears upon Long's innocence. The failure also directly led to and/or contributed to Defendants' repeated failure to comply with the dictates of the 2005 Evidence Order.

208. At all relevant times, Defendant City of Concord has had both knowledge of the pervasive and widespread issues with CPD evidence maintenance practices and the authority to compel changes to those deficient practices. Despite this knowledge and authority, Defendant City of Concord has failed to take corrective action.

### F. Evidence Subject to the 2005 Preservation Order is Finally Produced in 2015.

209. In 2013, Ronnie Long submitted a claim of actual innocence with the North Carolina Innocence Inquiry Commission ("NCIIC" or "Commission"). The Commission accepted Long's case and sought any existent evidence which could be subjected to DNA testing.

210. At some point in 2015 and despite prior representations by CPD and those speaking on its behalf, multiple fingerprint lift cards were obtained at CPD. These latent lifts should have been reported and produced to the Cabarrus DA and Long's trial team prior to his trial. The latent lifts also should have been produced in response to the 2005 Evidence Order. No explanation as to why the latent lifts were not found and produced by CPD in response to the 2005 Evidence Order has ever been provided.

211. On April 17, 2015, an independent fingerprint examiner retained by the commission, Marty Ludas ("Ludas"), obtained fingerprints from Long. His prints were compared against those found by the Commission somewhere within the CPD facility or its files. Ludas

concluded that none of the crime-scene latent lifts matched to Long, the same conclusion Isenhour reached in 1976.

## G. The City of Concord and CPD Continue to Obstruct the Interests of Justice.

212. Upon information and belief, at either the insistence of DA Vaneekhoven or the CPD, it was determined that CPD personnel would run the prints through an automated fingerprint identification system ("AFIS") database. As detailed below, a proper AFIS search of the crime-scene prints has not yet been conducted.

213. The independent expert, Marty Ludas, compared the crime-scene latent lifts to Long and to several "alternate suspects" identified by CPD. Ludas excluded Long and these six other individuals as a possible source of the crime-scene prints.

214. The names of the six individuals identified as "alternate suspects" were provided to Lau as counsel for Long. Notably, this disclosure, in July 2015, was the first occasion on which any attorney for Long was advised that any other individuals were considered "alternate suspects." No information beyond the names has ever been provided.

215. Trial counsel was never provided any information about any "alternate suspects" or why the individuals were at one time considered suspects.

216. Upon information and belief, the Commission ordinarily takes physical possession of evidence in cases which it accepts for investigation. Thus, the three envelopes of latent prints purportedly found by CPD in 2015 (or found by Commission investigators at CPD) would, under established practices, be sent to the Commission for analysis and appropriate investigation.

217. In this case, however, CPD retained possession of the three envelopes of latent prints from the crime-scene. Long's habeas attorneys at the Duke University School of Law Wrongful Convictions Clinic were provided a one-page Evidence Processing Report produced by

CPD. The Report states that "no possible contributors" of the latent lifts were identified when CPD ran the lifts through an offender database. CPD provided no information regarding any specific database queried or how the purported check was conducted.

218.    The CPD report language of "no possible contributors" is problematic and suggests that a proper offender database search was not conducted by CPD. A query <u>always</u> returns possible contributors, and the analyst must then make a subjective judgment whether any of the possible prints match the latent print in question.[9]

219.    Upon information and belief, the City of Concord and CPD have never undertaken the necessary training and instruction required to accurately conduct AFIS searches. On June 9, 2016, a public records request was submitted to CPD Chief Gary Gacek. The request, which was proper in all respects, sought "current and previously used policies and procedures for officers, employees, contractors, and/or any individual or groups' use of systems to index and compare latent fingerprints to those of known offenders on behalf of the Concord Police Department."

220.    The City of Concord, through an authorized representative, responded to the public records request on July 20, 2016 by producing a Word document titled "Concord Police Department Automated Fingerprint Identification System Standard Operating Procedures" (hereafter "SOPs"). The metadata "properties" of the Word document produced by the City of Concord revealed that the SOPs were created by CPD Detective Sergeant Brian Schiele on June 29, 2016 – <u>after</u> the date of the public records request and nearly sixteen months after CPD had purportedly conducted an AFIS query for the crime-scene fingerprint lifts.

221.    CPD Sergeant Schiele was the individual who signed the curious one-page Evidence Processing Report, referred to above and dated June 4, 2015, which reported that CPD's

---

[9] *See, e.g.,* Garrett, Brandon, <u>Autopsy of a Crime Lab: Exposing the Flaws in Forensics</u>, (2021), p. 50 (discussing submission of prints to a database "which will suggest a series of candidate prints").

purported AFIS query for the crime-scene fingerprint lifts "returned no possible contributors." Based upon the City of Concord's response to the public records request, CPD had no written SOPs for AFIS searches at the time it queried the crime-scene fingerprint lifts that had remained unaccounted for in CPD files for some 41 years, nor, on information and belief, did it have any such SOPs. CPD first created SOPs in response to a public records request and, most significantly, after CPD had made official representations about its analysis of the late-produced crime-scene prints.

222.    The circumstances under which CPD insisted on retaining custody of the latent prints from the crime-scene is even more concerning given that the independent examiner, Ludas, noted that three crime-scene prints are "DNA candidate prints." Thus, CPD is currently in possession of DNA evidence from the crime-scene which could potentially identify the perpetrator of the Bost rape, yet CPD has refused to relinquish custody of those fingerprint lifts. Additionally, a proper AFIS search could yield probative evidence as to the identity of the actual perpetrator of the Bost rape.

223.    During the pendency of Long's habeas claim, Lau sought the Commission file related to Long's innocence claim. The Commission stood ready to release its file to Lau pursuant to customary practice and established procedures. However, Cabarrus DA Vaneekhoven, on behalf of CPD, objected to release of the Commission file. Thus, to this day, Long's attorneys have been unable to ascertain where or how the fingerprint lifts from the crime-scene were purportedly found in 2015. Presumably, information within the files of CPD, the Cabarrus DA's Office, and/or the Commission will shed light on these critical questions.

224.    The actions of CPD and the City of Concord continue to obstruct a proper investigation of the Bost rape and potential identification of the actual perpetrator and also cause

further injury to Long in that obstructionism on the part of CPD and the City of Concord has frustrated and impeded Long's attempts to learn why exculpatory evidence continued to trickle out over the course of 41 years following his wrongful conviction.

## III. Long is Exonerated.

### A. The Fourth Circuit Holds that Ronnie Long's Constitutional Rights Were Violated.

225. On August 24, 2020, the United States Circuit Court of Appeals for the Fourth Circuit issued an *en banc* opinion in which it held that Ronnie Long's constitutional rights were violated when CPD investigators wrongfully withheld exculpatory and impeachment evidence from prosecutors in advance of Long's criminal trial.

### B. Ronnie Long's Convictions are Vacated, and he is Granted a Pardon of Innocence.

226. Following issuance of the Fourth Circuit opinion, the State joined in Long's request for habeas relief and Judge Catherine C. Eagles of the United States District Court for the Middle District of North Carolina issued an Order on August 27, 2020, vacating Mr. Long's convictions and ordering his immediate release from custody.[10]

227. Long was released from prison after 44 years of wrongful incarceration, but only after he had suffered grievous damages. Two of his sisters and both of his parents passed away while Long was wrongfully imprisoned. He will live his remaining days, haunted by the fact that his parents did not live to see their son cleared of wrongdoing.

228. Long's mother passed away just five weeks before he was finally released from prison. Her final words to Long's sister were: "Is Ronnie home yet?"

---

[10] Order, Long v. Hooks, 1:16-CV-539 (Aug. 27, 2020, M.D.N.C.), ECF No. 53.

229. On December 17, 2020, the Honorable Roy Cooper, Governor of the State of North Carolina, granted Ronnie Long a full Pardon of Innocence.

## CAUSES OF ACTION

## FEDERAL CONSTITUTIONAL CLAIMS

### COUNT I:

### 42 U.S.C. § 1983 Claim for Fourteenth Amendment Procedural and Substantive Due Process Violations – Civil Conspiracy to Deprive Plaintiff of his Constitutional Rights

(Against Defendants Isenhour, Taylor, Vogler, and Lee in their Individual Capacities and Defendant Moore in his Individual and Official Capacities)

230. Plaintiff hereby incorporates all of the foregoing paragraphs and further alleges as follows:

231. After the burglary and rape of Sarah Grayson Bost, Defendants knowingly conspired, reached a mutual understanding, and acted in concert to violate Long's constitutional rights, including his Fourteenth Amendment rights to substantive due process, to a fair trial, and not to be deprived of liberty without due process of law. Defendants reached an agreement amongst themselves to frame Long for the burglary and rape of Sarah Grayson Bost, despite Long's actual innocence and Defendants' knowledge that Long was, in fact, innocent.

232. In furtherance of the conspiracy, Defendants each undertook overt acts, including without limitation:

(a) Defendants caused a misdemeanor trespassing warrant to be taken out against Long on April 30, 1976 solely for the purpose of having him appear in district court on May 10, 1976 so that Defendants could fabricate an identification of Long as the victim's assailant.

(b) Defendants instituted the bogus trespassing charge against Long in bad faith and for the illicit purpose of orchestrating a false identification of Long as Bost's rapist.

(c) Defendants "marked" Long as the man Bost should select as her assailant by ensuring that Long was the only individual in the May 10, 1976 photo array wearing a leather jacket – the only consistent detail in the victim's identification of her assailant. Alternatively, Defendants simply instructed Bost to pick out Long from among the several line-up photographs, moments after they had signaled to her that she had identified the right individual during the unduly suggestive in-court "show-up" identification procedure Defendants had orchestrated.

(d) Upon information and belief, Defendants coached the victim with respect to her identification of her assailant so that the description morphed from one that, on the night of her rape, did not match Long (e.g. "light-skinned," "yellow black man," no mention of facial hair) to one, at trial, that did match Long, complete with a new detail about her assailant having a moustache and scruffy beard.

(e) Defendants withheld and suppressed exculpatory evidence, including three SBI lab reports which documented that there was no link whatsoever between Long and either the victim or the crime-scene.

(f) Defendants withheld and suppressed the fact that Defendant Isenhour obtained sixty-eight (68) latent fingerprint lifts at the crime-scene, compared them to Long, and determined that no crime-scene fingerprints belonged to Long. Defendant Isenhour affirmatively concealed this fact at trial when he offered false testimony in response to a question about "latent evidence" collected at the crime-scene and responded by only mentioning the shoe-bottom impression found on the column of the victim's house. The other Defendants sat mute at trial while Defendant Isenhour offered this perjured testimony and took no steps to correct it.

(g) Defendants Isenhour, Taylor, and Vogler offered false testimony at Long's criminal trial. Defendant Isenhour lied about what items he had taken to the SBI for analysis (concealing the fact that he had taken an additional 13 items of evidence for analysis) and falsely told the jury that the evidence had remained in his custody at all times (it had not). Defendants Isenhour, Taylor, and Vogler all offered false testimony when they said matches of a "similar nature" to those found at the crime-scene had been seized from the Long family car when those Defendants knew an SBI analyst had concluded that four of the matchbooks from the car were definitively excluded as a source of the crime-scene matches and that the fifth matchbook probably was <u>not</u> the origin.

(h) Defendants Lee and Taylor retrieved sexual assault evidence from Cabarrus Memorial Hospital just hours after the rape. Defendant Lee signed for this critical evidence at 12:35 a.m. on April 26, 1976. Defendants Lee and Taylor, upon information and belief, provided the sexual assault evidence

to Defendant Isenhour. None of the Defendants ever informed prosecutors that the evidence had been obtained and was under CPD control. None of the Defendants ever informed prosecutors that the sexual assault evidence kit had been disassembled or that the hair evidence had been submitted to the SBI for analysis and results obtained that were exculpatory of Long. At some subsequent point in time, Defendants destroyed the sexual assault evidence in bad faith because they knew that it would not inculpate Long and very likely would prove his innocence.

233.    Following Long's conviction, Defendants conspired, and continued to conspire, to deprive Long of exculpatory materials to which he was lawfully entitled and which would have proved his innocence and led to his exoneration.

234.    Defendants' conspiracy directly and proximately deprived Long of his rights under the Fourteenth Amendment and caused his unfair trial, wrongful conviction, and 44 years of wrongful incarceration. As a direct and foreseeable consequence of Defendants' conspiracy, Long suffered physical, emotional, and pecuniary injuries as described in this Complaint and to be proved through discovery and at trial.

### COUNT II:

### 42 U.S.C. § 1983 Claim for Deprivation of Due Process and Access to the Courts in Violation of the First and Fourteenth Amendments

(Against All Defendants)

235.    Plaintiff hereby incorporates all of the foregoing paragraphs and further alleges as follows:

236.    Defendants Isenhour, Taylor, Vogler, and Lee deprived Long of his constitutional right to due process of law and meaningful access to the courts by covering up and concealing from Long, prosecutors, and the courts, evidence that demonstrated Long's innocence.

237.    As a result of these Defendants' acts and omissions, Long was deprived of evidence that would have allowed him to successfully challenge his conviction through post-conviction

remedies that were available to him, including but not limited to a motion for appropriate relief based on new evidence under N.C. Gen. Stat. § 15A-1415(c)[11]. Such a motion, based on evidence which these Defendants hid and/or destroyed, would have been successful and would have exonerated Long and freed him from prison.

238.    Defendants Isenhour, Taylor, Vogler, and Lee were, at all relevant times, aware of Long's persistent and truthful denial of any involvement in the crimes committed against Sarah Grayson Bost. These Defendants were also aware of efforts on behalf of Long and others acting on his behalf to uncover evidence necessary to prove Long's innocence. These Defendants willfully interfered with Long's constitutional rights by continuing to deny him and those acting on his behalf access to evidence which would exonerate Long.

239.    Defendant City of Concord, acting in concert with the Concord Police Department and its Chiefs of Police, including Defendants Moore, Hamilton, Smith, and Gacek, and other currently unidentified individuals, deprived Long of his constitutional right of access to the courts.

240.    For decades, Defendant City of Concord and those acting at its behest took no action to conduct a proper search for evidence which would demonstrate Long had been wrongfully convicted and that CPD and Defendants Isenhour, Taylor, Vogler, and Lee had allowed the actual perpetrator of the Bost rape to remain free and go unpunished. The City of Concord failed to take any action to correct this injustice even after learning that the lead detective on the Long prosecution was a convicted felon who was living under an alias after committing theft and fraud crimes in multiple states in the years after he left the employ of CPD.[12]

---

[11] Prior to the enactment of N.C. Gen. Stat. § 15A-1415(c) in 1996, Long could have pursued post-conviction relief based upon new evidence under prior statutory vehicles such as N.C. Gen. Stat. § 15A-1415(b)(6) and N.C. Gen. Stat. § 15-174.

[12] United States v. Van Walter Isenhour, Docket No. C-CR-86-56 (W.D.N.C.) (Plea Agreement filed September 18, 1987; Judgment and Probation/Commitment Order filed October 13, 1987) (Isenhour pled

241.    Defendant City of Concord failed to implement any proper systems or controls to ensure that crime-scene evidence and records of criminal investigations were maintained. As a direct and proximate result of those systemic failures, which had the force of municipal policy or custom, the City of Concord and the Concord Police Department flouted the 2005 Evidence Order, failing to produce exculpatory evidence under their custody and control. Because of those failures, the evidence which led to Long's convictions being vacated and his exoneration in 2020 – <u>evidence which should have been produced to Long's trial team in 1976</u> – trickled out over the course of 41 years.

242.    Records which should document the receipt, transfer, custody, and ultimate disposition of all crime-scene evidence related to the Bost rape investigation do not exist. There should be evidence logs which track the chain of custody for each item of evidence collected. None exist. To the extent any evidence was destroyed or otherwise disposed of, there should be records documenting the destruction or ultimate disposition of any such evidence, inclusive of the details of such destruction of disposition (e.g. the name of the person who destroyed or disposed of the evidence, the date of same, the identity of a witness to such action, and identification of any court order or other such authority which allowed for destruction or other disposition of evidence). No such records exist.

243.    Evidence that Defendants obtained that could have been used to prove Long's innocence and potentially identify the actual perpetrator of the Bost rape – the victim's clothing she was wearing at the time of the rape (housecoat, underwear, pantyhose, and house slippers) and

---

guilty to Possession of a Stolen U.S. Treasury check and Failure to Appear; sentenced to two consecutive two-year terms of imprisonment); <u>State of North Carolina v. Van Walter Isenhour</u>, Docket Nos. 87 CRS 019538, 40-42, 44-47 (Mecklenburg County) (Transcript of Plea filed May 5, 1988) (Isenhour pled guilty to eight counts of Uttering a Forged Instrument with dates of offenses dating back to December 3, 1985; sentenced to a two-year term of imprisonment, suspended for five years).

the suspect hair found at the crime-scene – can no longer be accounted for but was all last under the custody and control of CPD. Other evidence, such as photographs of the victim and the crime-scene taken by CPD investigators, went missing without any explanation or documentation of its disposition.

244.    The failures on the part of the City of Concord and CPD Chiefs of Police to properly maintain and safekeep records and evidence related to the Bost rape investigation which directly interfered with Long's right to meaningful access to the courts and unnecessarily extended his period of wrongful incarceration include the following:

- CPD maintained no chain of custody documents for any of the crime-scene evidence collected in connection with the Bost rape investigation. Thus, CPD is unable to account for any evidence from the case that was last under CPD's custody and control. CPD cannot say whether the evidence still exists or what became of it.

- CPD maintained no records of destruction of any crime-scene evidence which may have been destroyed. Thus, CPD is unable to definitively say if, when, or how any crime-scene evidence from the Bost rape investigation may have been destroyed. Upon information and belief, no court order authorizing the destruction of any such crime-scene evidence was ever issued.

- Evidence from criminal cases was stored haphazardly and in various locations, with no master log documenting what evidence was received, where it was stored, or who last had custody of same. Following the issuance of the 2005 Evidence Order, the then-serving Evidence Control Officer, Sgt. Robert Ledwell, was unable to locate any evidence sheets from the Bost rape investigation. Because there was no computer or written documentation related to the crime-scene evidence, Ledwell was reduced to telephoning former CPD officers, including the original investigators and a former Evidence Control Officer to ask if they had any ideas where evidence responsive to the 2005 Evidence Order might be kept.

- The two Isenhour evidence summaries were not produced by CPD in response to the 2005 Evidence Order. Those critical documents were found by Long's MAR counsel who sought permission to personally examine a spiral notebook that Ledwell mentioned at a June 16, 2005 hearing. That request by Long's lawyers came <u>after</u> repeated representations on behalf of

CPD that diligent searches had revealed nothing of "evidentiary value" related to the Bost rape investigation or prosecution of Long.

- The three envelopes containing lift cards with fingerprints obtained at the crime-scene were not produced until some point in 2015 – ten years after issuance of Judge Spainhour's 2005 Evidence Order and 41 years after they should have been produced pre-trial pursuant to Brady. The crime-scene fingerprints were produced only after multiple false representations to the Court and Long's lawyers that no records or evidence remained under CPD custody and control.

- All items of crime-scene evidence, including the victim's clothing and a suspect hair found at the site of the rape, have been lost, misplaced, or destroyed. All such evidence was last known to be under the custody and control of CPD.

- The sexual assault evidence that CPD investigators took custody of on April 26, 1976 can no longer be accounted for but unquestionably was last under the custody and control of CPD.

245.    Defendant City of Concord stood behind the work of a disgraced detective – an individual convicted for stealing Social Security checks and multiple fraud offenses – while an innocent man languished in prison. Defendant Moore, the CPD Chief of Police at the time of Defendant Isenhour's arrest on federal crimes, should have called for an independent review of all criminal cases in which Isenhour had served as the lead detective or otherwise held any role in which his tendencies toward dishonest conduct could have affected the direction or outcome of a criminal prosecution. He failed to do so.

246.    Defendant Moore's successors who held the position of Chief of Police at critical times in which Long sought to prove his innocence – Defendants Hamilton, Smith, and Gacek – likewise failed to call for any review of criminal cases in which the dishonest practices of Defendant Isenhour and his co-conspirators (Taylor, Vogler, Lee, and Moore) could have affected the direction or outcome of a criminal prosecution. Defendant City of Concord, despite the authority and obligation to ensure the integrity of criminal investigations and prosecutions

undertaken by CPD, failed to act in any way to properly meet that obligation. In addition to refusing to undertake an honest review of his prosecution, City officials publicly opposed any effort to afford relief to Long through eligibility for parole or clemency.[13]

247.     Defendant City of Concord failed to take any action to review the conduct of CPD investigators, evidence technicians, and Chiefs of Police, and thereby ratified and condoned the misconduct of those individuals. The evidence which would exonerate Long trickled out over decades in spite of the deliberate indifference and willful obstructionism on the part of the City of Concord and CPD officials and employees. The most egregious example of this type of municipal misconduct was exposed by the July 2015 disclosure that CPD had in its possession crime-scene fingerprint lifts and the identity of individuals CPD had considered "alternate suspects" for the Bost rape.

248.     This exculpatory information (that crime-scene fingerprints were obtained, and none matched Long) and impeachment evidence (that CPD had "alternate suspects") should have been disclosed to Long's trial team in advance of his 1976 trial. Defendants Isenhour, Taylor, Vogler, and Lee hid this information. The evidence, however, clearly remained under the custody and control of the City of Concord and CPD. It should have been produced in response to the May 23, 2005 Order on Motion to Locate and Preserve Evidence issued by the Honorable W. Erwin Spainhour. No good reason can exist for the City of Concord and CPD failing to produce this critical evidence during the ten years following the 2005 Evidence Order.

---

[13] *See, e.g.,* Susanna Black, *After 44 years, charges dismissed against Concord man wrongly convicted of rape*, WSOC-TV *https://www.wsoctv.com/news/local/covid-19-threatens-inmate-who-says-he-was-wrongfully-convicted-rape-44-years-ago/BWUICK6RHZHI3KNVNZOK3CC5FI/* (Scott Padgett, acknowledged that, as Mayor of the City of Concord, he twice signed letters urging that Long not be considered for parole).

249.     It is an affront to the proper administration of justice that the first time any lawyer representing Long learned that there were crime-scene fingerprints obtained and that none matched Long was 41 years after his conviction. That miscarriage of justice violated Long's constitutional rights and is attributable both to the misconduct of the CPD detectives who caused his wrongful arrest and also the subsequent unlawful municipal policies and customs of the City of Concord.

250.     Defendant City of Concord created, promulgated, and maintained the following policies which deprived Long of his constitutional right to access the courts:

    (a)     Defendants created, promulgated, and maintained a policy of failing to properly and reasonably inventory, organize, and safekeep evidence and records of criminal investigations;

    (b)     Defendants created, promulgated, and maintained a policy of not maintaining, storing, and safekeeping evidence used to subject individuals to life sentences;

    (c)     Defendants created, promulgated, and maintained a policy of failing to make DNA evidence available to individuals upon request as required by N.C. Gen. Stat. § 15A-269;

    (d)     Defendants created, promulgated, and maintained a policy of failing to provide accurate and prompt responses to reasonable requests regarding the existence of evidence under Defendants' possession, custody, or control;

    (e)     Defendants created, promulgated, and maintained a policy of failing to abide court orders and other legal authority requiring an accounting of evidence under Defendants' possession, custody, or control; and

    (f)     In other respects to be proved through discovery and at trial.

251.     Defendants had in their possession evidence that would have proved Long's innocence of the heinous crimes for which he was convicted and wrongfully imprisoned. Long and his lawyers and agents repeatedly requested that he be provided access to the evidence, so that he could properly prove his innocence and end his wrongful incarceration. Defendants, through neglect, misconduct, and the adherence to unconstitutional policies, customs, and practices, falsely

represented that no evidence existed, and prevented Long from having access to evidence that would have exonerated him.

252.    Because of Defendants' misconduct, Long could not file a properly supported motion for appropriate relief based on new evidence under N.C. Gen. Stat. § 15A-1415(c) or otherwise obtain meaningful access to the courts and prove his innocence.

253.    The wrongful acts and omissions that caused Long's wrongful conviction and incarceration were carried out pursuant to the municipal defendant's policies, customs, patterns or practices as described in this Count.

254.    The municipal policies, customs or patterns and practices of the City of Concord proximately and directly caused Long's continued wrongful incarceration by systematically denying him and his representatives of evidence needed to prove his innocence.

255.    Defendants' actions and omissions directly and proximately deprived Long of his rights under the First and Fourteenth Amendments by unlawfully interfering with his right of access to the courts and needlessly extended his wrongful incarceration. As a result of Defendants' misconduct, Long was wrongfully imprisoned for 44 years, and suffered physical, emotional, and pecuniary injuries as described in this Complaint and to be proved through discovery and at trial.

## COUNT III:
### 42 U.S.C. § 1983 Claim Under *Monell v. Dep't of Social Servs.*

(Against Defendant City of Concord)

256.    Plaintiff hereby incorporates all of the foregoing paragraphs and further alleges as follows:

257.    Before, during, and after the unlawful investigation, prosecution and incarceration of Long, Defendant City of Concord and the Chief of Police of the Concord Police Department, in his official capacity and as the final policymaker, with deliberate indifference, maintained a policy,

custom, or pattern and practice of promoting, facilitating and condoning improper, illegal and unconstitutional investigative techniques by CPD investigators, and of failing to adequately train, supervise or discipline CPD investigators in connection with fundamental investigative tasks implicating the constitutional rights of suspects.

258.     The City of Concord and the Chief of Police also ratified and condoned the improper, illegal, and unconstitutional conduct of CPD investigators.

259.     It would have been plainly obvious to a reasonable policymaker that such policies, customs, or patterns and practices would lead to deprivations of suspects' constitutional rights.

260.     Jack Moore, the CPD Chief of Police from 1975 to 1987, was the final policymaker for the City of Concord with regard to all investigative activities conducted within his jurisdiction. Thereafter, Defendants Smith, Hamilton, and Gacek were final policymakers for the City of Concord during the time periods in which they held the position of Chief of Police.

261.     Because they were the final policymakers at all relevant times, the actions and omissions of Defendants Moore, Smith, Hamilton, and Gacek constituted the policy, custom, or pattern and practice of the City of Concord.

262.     As the final policymaker for the City of Concord, Defendant Moore created, promulgated and maintained, with deliberate indifference, the following policies, customs, or patterns which deprived Long of his constitutional rights, including but not limited to his rights not to be arrested or seized without probable cause, not to be deprived of his liberty without due process of law, to a fair criminal proceeding, and to meaningful access to the courts by:

> (a) Failing to properly train, supervise and/or discipline CPD investigators with regard to their constitutional duties not to (i) fabricate evidence; (ii) engage in suggestive identification procedures; (iii) conceal exculpatory evidence; (iv) destroy exculpatory evidence; (v) intentionally or recklessly fail to conduct an investigation to determine the true facts of a crime; and (vi) ignore evidence that points to the

innocence of a person who is serving a sentence for a crime he did not commit;

(b) Encouraging, promoting and condoning CPD investigators to (i) fabricate evidence; (ii) engage in suggestive identification procedures; (iii) conceal exculpatory evidence; (iv) destroy exculpatory evidence; (v) intentionally or recklessly fail to conduct an investigation to determine the true facts of a crime; and (vi) ignore evidence that points to the innocence of a person who is serving a sentence for a crime he did not commit and fostering a climate of impunity for engaging in such unconstitutional conduct;

(c) Creating, promulgating, and maintaining a policy, custom, or pattern and practice of failing to properly safeguard, organize or inventory evidence seized in connection with criminal investigations, and of failing to require that all evidence collected or received be immediately turned into a locked and secure property office, be logged into that office, and not be released except to an officer with authority in the investigation, and then only upon a signed, dated and timed receipt signed by that officer in the presence of the property control officer; and

(d) In other respects to be proved through discovery and at trial.

263. The wrongful acts and omissions that caused Long's wrongful arrest, prosecution, conviction, and incarceration were carried out pursuant to the municipal defendant's policies, customs, patterns or practices.

264. The municipal policies, customs, or patterns and practices of the City of Concord proximately and directly caused Long's wrongful arrest, prosecution, conviction, and incarceration.

265. At no point in time did any successor to Defendant Moore take any action to ameliorate the harms caused by the policies, customs, or patterns and practices of Defendant Moore. Likewise, no official with the City of Concord ever took any corrective action. To the contrary, the municipal defendant condoned and ratified the policies, customs, or patterns and practices of Defendant Moore and his successors.

266. As a direct and foreseeable consequence of the deficient municipal policies, customs, or patterns and practices as described above, Long was wrongfully incarcerated for 44 years and suffered physical, emotional, and pecuniary damages as described in this Complaint and to be proved through discovery and at trial.

## COUNT IV:

### 42 U.S.C. § 1983 Claim for Fourteenth Amendment Procedural and Substantive Due Process Violations – Withholding Exculpatory Evidence

(Against Defendants Isenhour, Taylor, Vogler, and Lee in their Individual Capacities)

267. Plaintiff hereby incorporates all of the foregoing paragraphs and further alleges as follows:

268. Defendants, while acting in concert and aiding and abetting one another, deprived Long of his constitutional right to a fair trial and fair legal process by concealing evidence that demonstrated there was no link whatsoever between Long and the crimes with which he would be charged.

269. Defendants intentionally and deliberately concealed from prosecutors and Long's defense team exculpatory evidence, including but not limited to the following:

(a) Sixty-eight (68) latent fingerprints were collected at the crime-scene, but no fingerprints were matched to Long;

(b) Three SBI lab reports were obtained by Defendants and the lab reports failed to document any link whatsoever between Long and either the victim or the crime-scene;

(c) An SBI analyst examined Long's clothing (jacket, gloves, and a toboggan Defendants claimed was his) and determined that there were no carpet or paint fibers from the victim's home on his clothing and prepared a written lab report documenting those findings;

(d) An SBI analyst examined the victim's clothing and determined that no hairs or hair fragments from Long were on the victim's clothing and prepared a written lab report documenting those findings;

(e) An SBI analyst prepared a written lab report documenting the fact that a comparison between Long's shoes and the latent shoe-bottom impression from the crime-scene established "there were an insufficient number of distinct characteristics noted by which to effect any identification;"

(f) An SBI analyst examined the five matchbooks seized from the Long family car and compared them to burned matches found at the crime-scene and prepared a written lab report documenting his findings that four of the matchbooks were definitively excluded as possible origins of the burned matches and the burned matches "probably did not originate" from the fifth matchbook;

(g) Individuals other than Long were considered "alternate suspects;"

(h) A suspect hair was collected at the crime-scene, at a location in the residence where the victim and her assailant fought, and an SBI analyst concluded that Long was excluded as a possible source of that suspect hair, a finding reflected in a written lab report;

(i) A sexual assault evidence kit was obtained at Cabarrus Memorial Hospital and the evidence concealed because Defendants knew the hair evidence was exculpatory and knew or believed the biological evidence would conclusively prove Long's innocence; and

(j) Such other exculpatory evidence as may be identified during discovery and introduced at the trial of this matter.

270. Defendants' concealment of this exculpatory evidence contributed to and caused Long's conviction for the rape and burglary of Sarah Grayson Bost, despite his actual innocence.

271. Defendants knew, or reasonably should have known, that the concealment of this exculpatory evidence was likely to lead to the conviction of Long for the rape and burglary of Bost, despite his actual innocence.

272. In deliberately withholding exculpatory evidence from prosecutors and Long's defense team, Defendants violated their clearly established duty to report all material exculpatory and impeachment evidence to prosecutors.

273. Defendants knew, or reasonably should have known, that the concealment of this exculpatory evidence was improper and violated Long's constitutional right to due process and a fair trial.

274. Absent Defendants' deliberate, bad faith misconduct, the prosecution of Long could not and would not have been pursued, and Long would not have been wrongfully convicted.

275. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Long's clearly established constitutional rights.

276. Defendants' deliberate, intentional and bad faith concealment of exculpatory evidence directly and proximately caused Long's wrongful arrest, conviction and deprivation of liberty without due process of law for crimes he did not commit, causing injuries and damages set forth in this Complaint.

277. All of the foregoing acts and omissions were committed under color of state law, and violated clearly established law of which any reasonable law enforcement officer would have known.

278. All of the foregoing acts and omissions were committed deliberately, intentionally, in bad faith, and/or with reckless disregard for the rights and safety of Long.

279. As a direct and proximate result of Defendants' deliberate, recklessly indifferent, and/or bad faith acts and omissions, Long was deprived of his Fourteenth Amendment rights to a fair trial and to not be deprived of his liberty without due process of law, was wrongfully convicted, and suffered 44 years of wrongful imprisonment, as well as physical, emotional, and pecuniary injuries described in this Complaint and to be proved through discovery and at trial.

**COUNT V:**

**42 U.S.C. § 1983 Claim for Fourteenth Amendment Procedural
and Substantive Due Process Violations – Fabrication of False
Inculpatory Evidence**

(Against Defendants Isenhour, Taylor, Vogler, and Lee in their Individual Capacities)

280.    Plaintiff hereby incorporates all of the foregoing paragraphs and further alleges as follows:

281.    Defendants, while acting in concert and aiding and abetting one another, deprived Long of his constitutional right to a fair trial and fair legal process by deliberately causing the fabrication of false inculpatory evidence.

282.    Specifically, Defendants fabricated inculpatory evidence against Long through the use of identification procedures that Defendants knew to be unfair and designed to intentionally cause the victim to mistakenly identify Long as her assailant.

283.    Due to personal animus toward Long and his family and the need to name a suspect in a high-profile case involving the widow of a long-time Cannon Mills executive, Defendants decided to target Long for prosecution for the rape and burglary of Sarah Grayson Bost. They did so even though no evidence suggested Long might be a suspect.

284.    Given the lack of any evidence suggesting Long's involvement in the crime, Defendants manufactured a faulty identification of him as the perpetrator and built a fraudulent criminal case against Long that was premised entirely on that mistaken identification that Defendants themselves orchestrated.

285.    As set forth in greater detail *infra*, Defendants manufactured a bogus misdemeanor trespassing warrant solely for the purpose of requiring Long to appear in district court on May 10, 1976. Defendants Isenhour and Taylor spoke with the victim on May 5, 1976 and told her they had reason to believe that her assailant would be in court on the morning of May 10, 1976.

286.    Long and his father, Ike Long, were among the ten to 12 Black men in the courtroom that day. Defendants Taylor and Vogler were also in court that morning, along with the victim, who wore a disguise – a red wig and glasses – at the suggestion of Defendants Isenhour and Taylor.

287.    Though she had, as instructed by Defendants, searched the faces of the ten to 12 Black men in the courtroom for about an hour or an hour and a half, the victim did not identify Long as her assailant until the judge called him by name to come forward to answer for the bogus trespassing charge, which was promptly dismissed.

288.    Within minutes after the trespassing charge against Long was dismissed, Defendants Isenhour, Taylor and Lee escorted the victim to the police station and showed her six to eight photographs, including the one of Long in a black leather jacket and another that, according to the victim, "looked like it might have been a woman."[14] Long was the only individual pictured who was wearing a jacket.

289.    The victim later testified at trial about the significance of the jacket in her mind: "[I]t was . . . if it wasn't the jacket, it was the identical, one identical to it. It was a leather jacket."[15] The victim's initial description of her assailant did not match Long. She described her attacker as "light-skinned" and as a "yellow black man." Long is a dark-skinned Black man. The only consistent detail in her description of her assailant was that he was wearing a dark leather jacket, a look common among young Black men at the time.

290.    By ensuring that Long was the only person in the photo array pictured in a jacket, Defendants Isenhour, Taylor and Lee "marked" Long as the one the victim should identify. Accordingly, the victim identified Long as her assailant. Significantly, the victim acknowledged

---

[14] Trial Tr. Vol. II, p. 46.
[15] Trial Tr. Vol. II, p. 47.

at trial that Defendants "could have" explicitly asked her to pick out Long from among the photos they showed her.

291.     There was no valid investigative reason for Defendants to orchestrate the unusual identification procedures used to have the victim identify Long as her assailant. Both the highly suggestive in-court identification procedure that Defendants devised – essentially an impermissible "show-up identification" – and the photo array in which Long was "marked" as the perpetrator by virtue of being the only individual wearing a leather jacket were highly unusual. The identification procedures that Defendants chose to use were intended to manufacture a false identification of Long as the perpetrator.

292.     Defendants' improper motives and bad faith are demonstrated by the fact that Long was only in court on May 10, 1976 because Defendants had engineered a bogus misdemeanor trespassing charge against him and subjected him to a false arrest.

293.     The false identification of Long was introduced at Long's trial in September 1976. There was no evidence of Long's guilt other than the victim's mistaken identification of him that Defendants had orchestrated.

294.     The fabricated identification of Long violated the Due Process Clause of the Fourteenth Amendment and deprived Long of a fair trial. At the time Defendants fabricated false inculpatory evidence against Long, upon information and belief, they knew that Isenhour had excluded Long as the source of all crime-scene fingerprints.

295.     In addition to fabricating a false identification of Long as the assailant, upon information and belief, Defendants Vogler and Lee, with the assent of Defendants Isenhour and Taylor "planted" a green toboggan in the Long family car. That toboggan would be used as evidence against Long at trial.

296.    On the evening of May 10, 1976, Defendants Taylor and Lee went to the Long family home and lied to Long and his parents. Defendants falsely told Long and his family that Long needed to go downtown for a few minutes to "straighten out" some issue with the trespassing charge that had been dismissed earlier that day. In response to a direct inquiry, Defendant Taylor assured Ike Long that his son did not need an attorney or anyone to go with him and that he would be back home shortly.

297.    Long then voluntarily followed the officers to the police station, where he was questioned by Defendants Taylor, Vogler, and Lee. Long truthfully denied any involvement in the attack on Bost. Defendant Vogler directed Long to empty his pockets and when Long did, Defendant Vogler grabbed the keys to the Long family car and searched the vehicle with Defendant Taylor. The search was conducted without valid consent and was unlawful.

298.    Defendants Vogler and Taylor claimed to find a green toboggan under the front seat of the Long family car. Upon information and belief, that claim was a fabrication. There was no toboggan in the Long family car when Long voluntarily drove it to the police station on May 10, 1976. Upon information and belief, Defendants Vogler and Taylor planted the toboggan in the car.

299.    The toboggan was introduced as evidence at Long's trial to establish that he possessed an article of clothing that the perpetrator of the Bost rape had worn during the crime.

300.    The introduction at trial of the fabricated evidence that the toboggan had been found in the Long family car deprived Long of a fair trial and due process of law. Based, in part, on the false and misleading evidence that Defendants created, Long was wrongfully convicted of the rape and burglary of Bost, despite his actual innocence.

301.    Defendants knew, or reasonably should have known, that the fabrication of false inculpatory evidence was likely to lead to the conviction of Long for the rape and burglary of Bost,

despite his actual innocence. They knew, or reasonably should have known, that their actions in fabricating false inculpatory evidence was improper and violated Long's constitutional right to due process and a fair trial.

302.    Absent Defendants' deliberate, bad faith misconduct, the prosecution of Long could not and would not have been pursued, and Long would not have been wrongfully convicted. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Long's clearly established constitutional rights.

303.    All of the foregoing acts and omissions were committed under color of state law, and violated clearly established law of which any reasonable law enforcement officer would have known.

304.    Defendants' fabrications directly and proximately caused Long's wrongful conviction and deprivation of liberty without due process of law for 44 years, as well as the physical, emotional, and pecuniary injuries described in this Complaint and to be proved through discovery and at trial.

## COUNT VI:

### 42 U.S.C. § 1983 Claim for Fourteenth Amendment Procedural and Substantive Due Process Violations – Bad Faith Destruction of Evidence

(Against Defendants Isenhour, Taylor, Vogler, and Lee in their Individual Capacities)

305.    Plaintiff hereby incorporates all of the foregoing paragraphs and further alleges as follows:

306.    In the manner described more fully above, Defendants destroyed evidence that Long could have used to prove his innocence. They did so in bad faith and with knowledge of the

clear and apparent exculpatory value of the evidence. Defendants destroyed evidence specifically so that Long could not prove his innocence at trial or thereafter.

307. Following the vicious assault upon her, the victim was transported by ambulance to Cabarrus Memorial Hospital. At the hospital, sexual assault evidence was obtained.

308. The sexual assault evidence consisted of combed pubic hair in a plastic bag, semen samples that were placed on three microscopic slides, and a stoppered test tube containing vaginal swabs which contained semen. Even in 1976, before the advent of DNA-testing, forensic testing of the sexual assault evidence (e.g. blood typing, titer and secretion tests) could have been conducted to exclude Long as the perpetrator.

309. The sexual assault evidence was released by Cabarrus Memorial Hospital to Defendant Lee at 12:35 a.m. on April 26, 1976. Upon information and belief, Defendant Taylor accompanied Defendant Lee when the sexual assault evidence was retrieved. The evidence was then delivered to Defendants Isenhour and Taylor.

310. Defendants did not inform prosecutors that sexual assault evidence had been collected by the ER physician at Cabarrus Memorial Hospital or that Defendants had taken possession of that critical evidence.

311. Upon information and belief, Defendants Isenhour and Taylor, acting in concert with Defendants Lee and Vogler, destroyed the sexual assault evidence. Prior to destruction of the sexual assault evidence, Defendants disassembled the evidence kit. The victim's pubic hair combings were among the items of evidence submitted to the SBI Lab in Raleigh for analysis and Defendants had actual knowledge of the exculpatory nature of all hair evidence submitted to the SBI.

312.     With respect to the biological evidence contained in the sexual assault evidence kit, it is not yet known whether Defendants destroyed this evidence because (i) they had it tested and thus had actual knowledge that it did not implicate Long, or (ii) destroyed the evidence prior to any testing because they knew it would not be inculpatory. Regardless, all portions of the sexual assault evidence kit were destroyed by Defendants in bad faith, with malice, and with knowledge of its exculpatory value.

313.     The trial evidence from Long's criminal case is currently held by the Cabarrus County Clerk of Court. All evidence that Defendants obtained that could have been used to exclude Long as a suspect – the sexual assault evidence, the suspect hair found at the site of the rape, and the victim's clothing – can no longer be accounted for but was all last under the custody and control of Defendants and the Concord Police Department. Following the acceptance of DNA evidence in North Carolina courts, this same evidence could have been tested and used to prove Long's innocence and to identify the actual perpetrator of the Bost rape.

314.     Defendants' destruction of the sexual assault evidence was objectively unreasonable and was undertaken intentionally and with willful indifference to Long's constitutional rights.

315.     Defendants knew, or reasonably should have known, that the bad faith destruction of evidence was likely to lead to the conviction of Long for the rape and burglary of Bost, despite his actual innocence. These actions were committed under color of state law, and violated clearly established law of which any reasonable law enforcement officer would have known.

316.     As a direct and proximate result of Defendants' concealment and destruction of sexual assault evidence, Long was deprived of his Fourteenth Amendment rights to a fair trial and to not be deprived of his liberty without due process of law. As a result of Defendants' misconduct,

Long was wrongfully convicted and subjected to 44 years of wrongful incarceration and suffered physical, emotional, and pecuniary injuries as described in this Complaint and to be proved through discovery and at trial.

## COUNT VII:

### 42 U.S.C. § 1983 Claim for Fourth and Fourteenth Amendment Violations – Federal Malicious Prosecution

(Against Defendants Isenhour, Taylor, Vogler, and Lee in their Individual Capacities)

317.     Plaintiff hereby incorporates all of the foregoing paragraphs and further alleges as follows:

318.     As described more fully above, a criminal proceeding was instituted and continued against Long, despite his actual innocence. The prosecution was initiated and continued without probable cause to believe that Long had committed the crimes with which he was charged.

319.     At the time Long was arrested, there was no probable cause to believe he had been involved in any way in the burglary and rape of Sarah Grayson Bost.

320.     Defendant Taylor was the sole witness before the magistrate who issued the arrest warrant for first-degree burglary and first-degree rape on May 10, 1976, and again, Defendant Taylor was the sole witness before the Grand Jury which indicted Long for those offenses on May 17, 1976. In both instances, the "case" Defendant Taylor presented, first to the magistrate and later to the Grand Jury, was one that had been manufactured collectively by Defendants.

321.     At the time Defendants initiated criminal proceedings against Long, Defendants knew the following:

> (a) Long did not match the victim's description of her assailant. She described her assailant as "light-skinned" and as a "yellow black man." Long is a dark-skinned Black man. There was no mention of facial hair in the victim's early descriptions of her attacker. Long, at the time, always wore a moustache and scruffy beard, details that would be added to the victim's description later – after she had been coached by Defendants.

78

(b) Not a single fingerprint from among the sixty-eight (68) latent lifts that Defendant Isenhour collected at the crime-scene matched Long.

(c) No physical evidence whatsoever connected Long to the victim or the crime-scene.

(d) Long's whereabouts on the night Bost was attacked were accounted for and corroborated by multiple independent witnesses.

(e) Long had no scratches, scrapes, bruises, or injuries of any sort upon his face or body, while Defendants also knew that the victim had forcefully resisted and scratched her attacker to the degree that her fingernails were "all sore" and some "had been bent backward," which she attributed to the struggle with her attacker.

(f) A suspect hair found and collected at the crime-scene, in an area of the house where the victim had fought to avoid being dragged upstairs by her attacker, had a reddish sheen to it. Even a visual inspection of the hair indicated to Defendants that the suspect hair could not have originated from Long.

(g) The victim's "identification" of Long as her assailant was a fabrication orchestrated by Defendants, as set forth in greater detail *infra*.

322.     There existed no valid evidence upon which to initiate charges against Long at the time of his arrest on May 10, 1976. Roughly one week later, when Defendants received the three SBI lab reports, Defendants were in possession of additional evidence of Long's innocence. Instead of providing that exculpatory evidence to prosecutors, Defendants pressed ahead with the criminal prosecution of Long.

323.     The arrest of Long without probable cause violated Long's Fourth and Fourteenth Amendment rights.

324.     Defendants' conduct in causing the arrest of Long was malicious, and evidenced a reckless and callous disregard for, and deliberate indifference to, Long's constitutional rights.

325.     Defendants' unconstitutional conduct was committed in the course and scope of their employment with the City of Concord and the Concord Police Department and under color of state law.

326.     The criminal proceeding initiated by the unconstitutional arrest of Long was finally terminated in his favor on December 17, 2020, when Governor Roy Cooper granted Long a full Pardon of Innocence.

327.     As a direct and foreseeable consequence of Defendants' misconduct, Long was unreasonably and unlawfully subjected to criminal prosecution and 44 years of wrongful incarceration.

328.     As a direct and foreseeable consequence of being arrested, prosecuted, and wrongfully imprisoned for 44 years, Long suffered physical, emotional, and pecuniary injuries as described in this Complaint and to be proved through discovery and at trial.

## COUNT VIII:
## 42 U.S.C. § 1983 Claim for Failure to Intervene

(Against All Defendants)

329.     Plaintiff hereby incorporates all of the foregoing paragraphs and further alleges as follows:

330.     In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of Defendants stood by without intervening to prevent the violation of Long's constitutional rights, even though they had the opportunity to do so.

331.     As a result of Defendants' failure to intervene to prevent the violation of Long's constitutional rights, Long suffered injuries, including but not limited to loss of liberty, physical

harm, pecuniary losses, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

332. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, with malice and willful indifference to Long's clearly established constitutional rights, and was so reckless as to demonstrate a substantial lack of concern for whether an injury would result.

333. Long's injuries were caused by the policies, practices, and customs of Defendant City of Concord in that employees and agents of CPD regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false inculpatory evidence, orchestrated unduly suggestive witness identifications, elicited and failed to correct false testimony, pursued wrongful convictions through profoundly flawed investigations, failed to comply with court orders and lawful requests for post-conviction production of crime-scene evidence and investigatory materials and records, and otherwise violated due process in a manner similar to that alleged herein.

334. The above-described widespread practices, which were so well-settled as to constitute the de facto policy of the City of Concord, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

335. The misconduct described in this Count was undertaken pursuant to the policy and practices of the City of Concord in that the constitutional violations at issue were committed with the knowledge or approval of persons with final policymaking authority for the City of Concord and the CPD, or were actually committed by persons with such final policymaking authority.

336. The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Long to

suffer the grievous and permanent injuries and damages as described in this Complaint and to be proved through discovery and at trial.

## STATE-LAW CLAIMS

## COUNT IX:
## Obstruction of Justice

(Against All Defendants)

337.     Plaintiff hereby incorporates all of the foregoing paragraphs and further alleges as follows:

338.     In committing the foregoing acts and omissions, Defendants prevented, obstructed, impeded, or hindered public or legal justice in that they fabricated and withheld evidence, destroyed exculpatory evidence, and elicited and failed to correct false testimony, preventing Long from successfully mounting a defense to criminal charges. Thereafter, Defendants destroyed and/or lost additional evidence which could have been used to exonerate Long and identify the individual who actually committed the burglary and rape of Sarah Grayson Bost. Additionally, Defendants failed to safekeep crime-scene evidence and investigatory records and disregarded a court order requiring them to account for evidence under the possession, custody, or control of CPD and thereby frustrated and impeded Long's right to obtain critical evidence necessary to prove his wrongful conviction.

339.     The misconduct described in this Count was undertaken intentionally, willfully, and with malice.

340.     Defendants had in their possession evidence that would have proved the wrongfulness of Long's conviction and brought his wrongful incarceration to an end. For more than four decades, they wrongfully denied Long and his attorneys access to materials and evidence to which they were clearly entitled.

341.     Defendants, through neglect, misconduct, and the adherence to unconstitutional policies, customs, and practices, obstructed justice by preventing Long from having access to evidence that would have exonerated him.

342.     As a direct and proximate result of Defendants' obstruction of justice, Long was wrongfully imprisoned for 44 years, and suffered physical, emotional, and pecuniary damages.

**COUNT X:**

**North Carolina Constitutional Claim, Art. I, §§ 19-20,**
**Violations of Due Process**

(Against All Defendants)

343.     Plaintiff hereby incorporates all of the foregoing paragraphs and further alleges as follows:

344.     Pleading in the alternative to the above Counts, as described more fully above, Defendants, while acting individually, jointly, and in conspiracy, as well as under color of state law and within the scope of their employment, deprived Long of his constitutional rights under Art. I, §§ 19 and 20 of the Constitution of North Carolina in one or more of the following ways:

(a) By instituting, procuring, and participating in the criminal prosecution of Long without probable cause;

(b) By fabricating evidence they knew to be false, including a false identification of Long as the perpetrator through unlawful identification procedures orchestrated by CPD detectives;

(c) By obtaining Long's conviction using false evidence;

(d) By concealing exculpatory evidence from Long and his trial team and by destroying other evidence they knew to be exculpatory; and

(e) By falsely representing to the Cabarrus County Superior Court and to Long and his lawyers that no evidence remained under Defendants' custody when the evidence which would have ended Long's wrongful incarceration was at all times under the custody and control of the City of Concord and CPD.

345. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Long's rights under the North Carolina Constitution.

346. As a direct and proximate result of Defendants' unconstitutional acts and omissions, Long was wrongfully imprisoned for 44 years, and suffered physical, emotional, and pecuniary damages as described in this Complaint and to be proved through discovery and at trial.

## COUNT XI:

## Respondeat Superior

(Against All Defendants)

347. Plaintiff hereby incorporates all of the foregoing paragraphs and further alleges as follows:

348. In committing the acts alleged in the previous paragraphs, Defendants were employees or agents of the City of Concord, acting within the scope of their employment.

349. The City of Concord has waived its immunity by purchasing insurance pursuant to N.C. Gen. Stat. § 160A-485(a).

350. Therefore, the City of Concord is liable as principal for the torts committed by its agents in the course and scope of their employment under the doctrine of respondeat superior.

## COUNT XII:

## Indemnification

(Against All Defendants)

351. Plaintiff hereby incorporates all of the foregoing paragraphs and further alleges as follows:

352.    The City of Concord is permitted by state law and, on information and belief, has elected to pay any final judgment against an employee that results from an act done or omission made in the scope and course of his or her employment with the City.

353.    In committing the acts alleged in this Complaint, the named Defendants were at all times employees of the City of Concord and acting within the course and scope of their employment.

**COUNT XIII:**

**Punitive Damages**

(Against All Individual Defendants)

354.    Plaintiff hereby incorporates all of the foregoing paragraphs and further alleges as follows:

355.    The acts of the individual Defendants and constitutional violations alleged above were willful, wanton and intentional and evinced a reckless disregard for and indifference to the rights and safety of the public, including Ronnie Long, who as a result spent 44 years in prison for crimes he did not commit.

356.    At the time the individual Defendants falsely charged Long with first-degree rape and first-degree burglary and manufactured a prosecution against him for those offenses, the crimes with which Long was charged were punishable by, respectively, a mandatory death sentence and a mandatory life imprisonment sentence. Defendants knew, at the time they plotted the illicit scheme to frame him for the rape of Sarah Grayson Bost, that Long would be subject to death by execution. The egregious and shocking nature of Defendants' misconduct warrants imposition of punitive damages against them.

357.    The acts alleged above proximately caused the injuries suffered by Long, and he is entitled to recover punitive damages.

## DAMAGES

358.   As a direct and proximate result of Defendants' violation of Long's civil and constitutional rights and obstruction of justice, Long was arrested, deprived of a fair trial, wrongfully convicted, and imprisoned for more than 44 years for crimes he did not commit.

359.   As a result of Long's wrongful conviction and imprisonment, Long sustained physical injuries and sicknesses and other personal injuries, entitling him to recover compensatory damages. Those injuries include but are not limited to:

(a)  humiliation, indignities, and embarrassment;

(b)  damage to reputation;

(c)  damage to family relations;

(d)  inadequate medical and dental care;

(e)  poor nutrition;

(f)  physical pain and suffering;

(g)  severe emotional distress;

(h)  depression;

(i)  loss of employment, wages, and benefits;

(j)  diminished earning capacity;

(k)  restrictions on all forms of personal freedom including but not limited to diet, sleep, human contact, educational opportunity, employment, athletic opportunity, physical activity, personal fulfillment, parental responsibilities, access to media and technology, travel, and the right to express one's self and to live a life of one's own choosing; and

(l)  such other injuries as may be shown by the evidence.

360.   As a result of Defendants' wrongful actions, Long was denied the chance to aid his family and to be with his beloved parents in their final days. Both his parents passed away before

they could witness their son's name cleared – before the cloud over their family name was finally removed.

361. The acts of the individual Defendants alleged above were willful, wanton, intentional, and evinced a reckless disregard for and indifference to the rights and safety of the public, including Ronnie Long, who as a result spent 44 years in prison for crimes he did not commit.

362. Defendants are jointly and severally liable to Long for compensatory damages resulting from the violation of his civil rights, obstruction of justice, and wrongful conduct as described herein. For the reasons set forth above, the individual Defendants should also be subject to punitive damages in an amount sufficient to punish them for their wrongful actions and to deter others from such misconduct in the future.

363. Long is entitled to recover his reasonable attorneys' fees and litigation expenses from Defendants pursuant to 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

Based on the foregoing, Plaintiff respectfully prays for the following relief:

1. Compensatory damages from Defendants, jointly and severally, in an amount to be determined at trial;

2. Punitive damages from Defendants, jointly and severally, in an amount to be determined at trial, that will deter such conduct by Defendants and other officials and law enforcement officers in the future;

3. Reasonable attorneys' fees and litigation expenses from Defendants under 42 U.S.C. § 1988;

4. Costs of court and interest as allowed by law;

5.    A trial by jury on all contested issues of fact; and

6.    Such other and further relief as the Court may deem just and proper.


This the 3rd day of May 2021.

**LAW OFFICES OF JAMES SCOTT FARRIN**
*Attorneys for Plaintiff Ronnie Wallace Long*


By:    */s/ Hoyt G. Tessener*
       Hoyt G. Tessener (State Bar No. 16068)
       Coleman M. Cowan (State Bar No. 21997)
       Chris Bagley (State Bar No. 50567)
       Kaitlyn E. Fudge (State Bar No. 54829)
       280 S. Mangum Street, Suite 400
       Durham, North Carolina 27701
       Telephone: (919) 688-4991
       Facsimile: (919) 328-5355
       htessener@farrin.com


**OLSON LAW, PLLC**
*Attorney for Plaintiff Ronnie Wallace Long*


By:    */s/ G. Christopher Olson*
       G. Christopher Olson (State Bar No. 21223)
       514 Daniels Street, #136
       Raleigh, NC 27605
       Telephone: (919) 624-3718
       Facsimile: (919) 328-5355
       chris@olsonlaw-pllc.com