IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:21-CV-201-D

| | |
|---|---|
| RONNIE WALLACE LONG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| CITY OF CONCORD, et al., | ) |
| | ) |
| Defendants. | ) |

On June 11, 2021, Ronnie Wallace Long ("Long" or "plaintiff") filed an amended complaint against the City of Concord, Van Walter Isenhour, David John Taylor, the estate of George Monroe Vogler, Jr., the estate of Marshall James Lee, the estate of Jack Moore, Merl Hamilton, Guy Smith, Gary Gacek, Barry M. Lea, the estate of Charles D. Chambers, the estate of Haywood R. Starling, John H. Watters, John and Jane Doe defendants, and unknown agents of the North Carolina State Bureau of Investigation ("SBI") [D.E. 24]. Long alleges eleven claims under 42 U.S.C. § 1983 and six state-law claims seeking compensatory and punitive damages. See id. On September 27, 2021, defendants Barry M. Lea ("Lea") and John H. Watters ("Watters") moved to dismiss Long's claims against them under Federal Rules of Civil Procedure 12(b)(1), (2), and (6), and filed a memorandum in support [D.E. 45, 46]. On January 31, 2022, the estate of Haywood R. Starling ("Starling") moved to dismiss Long's claims against Starling under Rules 12(b)(1), (2), and (6), and filed a memorandum in support [D.E. 61, 62]. On November 8, 2021, and February 21, 2022, Long responded in opposition to the motions to dismiss [D.E. 51, 64, 68]. Lea, Watters, and Starling did not reply, and the time within which to do so has expired. As explained below, the court denies the motions to dismiss.

I.

Long was wrongfully incarcerated for more than 44 years for a burglary and rape he did not commit. See Am. Compl. [D.E. 24] ¶¶ 1–2. Throughout his incarceration, Long maintained and sought to prove his innocence. See id. ¶ 27. Now free, Long alleges numerous federal and state law claims. See id. ¶¶ 30–31. In Long v. Hooks, 972 F.3d 442, 446–56 (4th Cir. 2020) (en banc), the United States Court of Appeals for the Fourth Circuit described in detail the underlying burglary and rape, the investigation, Long's trial, Long's persistent efforts to obtain exculpatory evidence never previously disclosed to him or his counsel, and Long's state and federal post-conviction proceedings. See id. Here, the court summarizes Long's allegations against Lea, Watters, and Starling specifically.

Lea was a special agent with the SBI and was the SBI special agent assigned to work with the City of Concord Police Department ("CPD") to investigate the rape of Juddy Bost ("Bost"). See id. ¶¶ 52, 69. Long alleges that Lea helped to collect evidence at the crime scene and interviewed Bost, Long, and an alternative suspect. See id. ¶¶ 70, 88–89. At Bost's residence, Lea and defendants Vogler and Isenhour "went through the entire Bost residence, room by room, searching for latent lifts of identifiable value" and other evidence. Id. ¶ 73. The team found burned matches and numerous latent prints at the residence. See id. ¶ 75. Long alleges that Lea knew by May 10, 1976 (i.e., the date of Long's arrest) that none of the prints found at Bost's residence matched Long. See id. ¶¶ 99, 341–42.

On May 10, 1976, CPD officers arranged for Bost to sit in Cabarrus County District Court to see if anyone appearing for court looked like her assailant. See id. ¶¶ 92–93. Long alleges that CPD officers fabricated a false trespassing charge against Long to ensure he would be in the courtroom that day. See id. ¶¶ 86–88, 96. On May 10, 1976, Long appeared for court wearing a

2

black leather jacket, as he often did. See id. ¶ 94. And Bost identified Long in the courtroom as her attacker. See Long, 972 F.3d at 447; Am. Compl. ¶¶ 94, 97–98. Soon after the Cabarrus County District Court dismissed the trespassing charge against Long, CPD officers took Bost to the police station and showed her a photo array. Long was the only person in the array wearing a leather jacket. See Am. Compl. ¶¶ 97–98. Bost picked Long from the photo array. See id. Long alleges that Lea participated in orchestrating these suggestive identifications of Long. See id. ¶ 86.

Long alleges that Lea, along with defendants Taylor, Vogler, and Lee, "embarked upon an illicit scheme to hide all favorable evidence from prosecutors and Long's attorneys." Id. ¶ 123. Defendants Isenhour, Taylor, Vogler, and Lee were the primary CPD officers working with Lea to investigate Bost's rape. They allegedly knew that the SBI lab reports analyzing evidence from Bost's residence "demonstrated there was no link between Long and the crime." Id. ¶ 128. Long alleges these defendants intentionally withheld these exculpatory SBI lab reports from the Cabarrus County district attorney ("DA"), thereby depriving the DA of the ability to produce that evidence to Long and his counsel. See id. ¶¶ 123, 128. In effect, Long alleges Lea and the CPD officers misled the DA. Long alleges that the DA had an "'open file' discovery" policy and would have produced the SBI lab reports to Long. See id. ¶ 129. Moreover, Lea and the CPD officers allegedly did not even tell the DA that they had recovered numerous prints from Bost's residence. See id. ¶ 132. As a result, "Long's defense team never learned that a search for suspect prints had been undertaken and that no crime-scene fingerprints matched Long." Id.

On May 13, 1976, three days after Long's arrest, Lea conducted a polygraph examination on an alternative suspect. See id. ¶¶ 143–45. Neither Lea nor anyone else disclosed to Long and his attorneys that the examination took place until May 6, 2021, more than four decades later. See id.

3

Long alleges that the records he now has concerning investigations into alternative suspects are still incomplete. See id. ¶ 145.

Long alleges that because of Lea's role in concealing exculpatory evidence, Long's defense team "had little evidence with which to attack [Bost's identification of Long], which was, for all intents and purposes, the entirety of the prosecution case." Id. ¶¶ 167–69. Long also alleges that Lea, along with defendants Isenhour, Taylor, Vogler, and Lee, "orchestrated and manufactured" the case the prosecution presented to the jury, leading the jury to "erroneously credit[] the victim's mistaken identification" of Long as her attacker. Id. ¶ 180.

During the investigation, Starling was the Director of the SBI and was responsible for training and supervising SBI employees, including Lea. See id. ¶ 54. Because the case was high profile, Lea updated Starling on the status of the investigation and prosecution of Long. See id. ¶¶ 71, 82. For example, Lea wrote correspondence to Starling concerning the case. Id. ¶ 82. Additionally, Long alleges Starling knew early in the investigation that none of the crime-scene fingerprints matched Long. See id. ¶ 132. Even though Starling knew of the exculpatory SBI lab reports, he failed to produce them to Long and his counsel and failed to ensure Lea or other SBI employees did so. See id. ¶¶ 123, 359. Long alleges that because of these failures, Starling knew Long would face trial "without the benefit of exculpatory and impeachment evidence." Id. ¶¶ 128, 145.

In 2005, decades after his conviction, Long obtained a court order directing the SBI to locate, preserve, and produce to Long and his counsel all evidence from the investigation. See id. ¶¶ 192–96. Watters was SBI's legal counsel and responded to the court order. See id. ¶ 197. Watters represented that "he had personally undertaken coordination" to search for evidence but stated that the SBI does not keep evidence submitted to it for analysis. Id. ¶ 198. He also stated that "[n]one

4

of the evidence listed [in the order] was found to be in the possession of the Bureau," except possibly the "'rape kit' that was apparently done on [Bost]." Id. ¶¶ 198, 217. Nonetheless, a separate inquiry to the SBI for evidence, of which Watters was not a part, resulted in finding "three previously undisclosed SBI lab reports." Id. ¶ 213.

In May 2016, Long sought federal habeas relief in the United States District Court for the Middle District of North Carolina. See id. ¶ 221. North Carolina opposed Long's request to conduct discovery concerning his habeas petition. See id. ¶ 222. In part, North Carolina argued that the SBI, pursuant to the 2005 court order, already had searched for exculpatory evidence and argued that Long "show[ed] no objective evidence warranting a rational belief that any further exculpatory evidence or material exists." Id. Long alleges that the North Carolina Attorney General took that position in consultation with Watters, who was still SBI's legal counsel. See id. ¶ 223.

Long alleges claims against Lea in his individual capacity under 42 U.S.C. § 1983 for (1) denial of procedural and substantive due process in violation of the Fourteenth Amendment (count one); (2) denial of access to the courts in violation of the First and Fourteenth Amendments (count two), (3) withholding exculpatory evidence in violation of Long's constitutional rights (count four), and (4) federal malicious prosecution in violation of the Fourth and Fourteenth Amendments (count seven). See id. ¶¶ 250–75, 287–99, 337–48. Long also alleges North Carolina state law claims against Lea for obstruction of justice (count sixteen) and due process violations under the North Carolina Constitution (count seventeen). See id. ¶¶ 411–23.

Long alleges claims against Starling in his individual capacity under 42 U.S.C. § 1983 for failure to intervene concerning the withholding of exculpatory evidence (count nine) and for withholding exculpatory evidence in violation of Long's constitutional rights (count eleven). See id. ¶¶ 357–66, 384–93. Long also alleges North Carolina state law claims against Starling for

5

obstruction of justice (count sixteen) and due process violations under the North Carolina Constitution (count seventeen). See id. ¶¶ 411–23.

Long alleges claims against Watters in his individual capacity under 42 U.S.C. § 1983 for due process violations and denial of access to the courts under the First and Fourteenth Amendments (count ten) and North Carolina state law claims for obstruction of justice (count sixteen) and due process violations under the North Carolina Constitution (count seventeen). See id. ¶¶ 367–83, 411–23.

II.

The court has reviewed Long's claims against Lea, Starling, and Watters under the governing standard. See Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165–66 (4th Cir. 2016); E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarrantano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). In considering the motion, the court construes the facts and reasonable inferences in the light most favorable to the nonmoving party. See Massey v. Ojaniit, 759 F.3d 343, 352–53 (4th Cir. 2014). Taking the allegations in Long's amended complaint and all reasonable inferences drawn therefrom as true, Long has plausibly alleged his claims against Lea, Starling, and Watters. Cf. Long, 972 F.3d at 446–71. Accordingly, the court denies the motions to dismiss.

In opposition, Lea, Starling, and Watters raise several defenses. The court considers each.

A.

Lea and Watters argue that to the extent Long sues them in their official capacities, the Eleventh Amendment bars the suit. Although some claims do not specify whether Long sued Lea

and Watters in their official or individual capacities, e.g., Am. Compl. ¶¶ 418–23, Long's introduction of the parties in his amended complaint specifies that he is suing Lea and Watters solely in their individual capacities. See id. ¶¶ 52, 55. The Eleventh Amendment does not bar Long's claims against Lea and Watters. See Hafer v. Melo, 502 U.S. 21, 29–31 (1991); Ex Parte Young, 209 U.S. 123, 159–60 (1908); Adams v. Ferguson, 884 F.3d 219, 225 (4th Cir. 2018); Sales v. Grant, 224 F.3d 293, 297 (4th Cir. 2000).

B.

Lea, Watters, and Starling argue they are entitled to qualified immunity and move to dismiss on that basis. Under this doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see City of Escondido v. Emmons, 139 S. Ct. 500, 503–04 (2019) (per curiam); Kisela v. Hughes, 138 S. Ct. 1148, 1152–55 (2018) (per curiam); Dist. of Columbia v. Wesby, 138 S. Ct. 577, 589–93 (2018); Hernandez v. Mesa, 137 S. Ct. 2003, 2007 (2017) (per curiam); Ziglar v. Abbasi, 137 S. Ct. 1843, 1866–67 (2017); White v. Pauly, 137 S. Ct. 548, 551–52 (2017) (per curiam); Mullenix v. Luna, 577 U.S. 7, 11–13 (2015) (per curiam); Taylor v. Barkes, 575 U.S. 822, 825–26 (2015) (per curiam); City & Cnty. of S.F. v. Sheehan, 575 U.S. 600, 611 (2015); Carroll v. Carman, 574 U.S. 13, 16–17 (2014) (per curiam); Reichle v. Howards, 566 U.S. 658, 664 (2012). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see Kisela, 138 S. Ct. at 1152.

In analyzing qualified immunity, the court asks "whether the facts that a plaintiff has shown . . . make out a violation of a constitutional right," and "whether the right at issue was clearly

7

established at the time of [the] defendant's alleged misconduct." Pearson v. Callahan, 555 U.S. 223, 232 (2009) (quotations omitted); see Wood v. Moss, 572 U.S. 744, 757 (2014); Knibbs v. Momphard, 30 F.4th 200, 214 (4th Cir. 2022); Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011); Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010). Courts may decide which question to address first. See Pearson, 555 U.S. at 236. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (cleaned up); see Rivas-Villegas v. Cortesluna, 142 S. Ct. 4, 7 (2021) (per curiam). Although a case need not be directly controlling, "existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741; see Rivas-Villegas, 142 S. Ct. at 7–8; Reichle, 566 U.S. at 664. Qualified immunity shields a defendant if the answer to either question is "no." See Reichle, 566 U.S. at 664; al-Kidd, 563 U.S. at 735; Miller v. Prince George's Cnty., 475 F.3d 621, 627 (4th Cir. 2007); Bostic v. Rodriguez, 667 F. Supp. 2d 591, 605–06 (E.D.N.C. 2009).

A defendant may raise a qualified immunity defense in a Rule 12(b)(6) motion. See Owens v. Balt. City State's Attorney's Office, 767 F.3d 379, 396 (4th Cir. 2014). However, a defendant must overcome a "formidable hurdle" to successfully assert a qualified immunity defense "at this early stage in the proceedings." Id. (quotation omitted); see Field Day, LLC v. Cnty. of Suffolk, 463 F.3d 167, 191–92 (2d Cir. 2006). Under the Rule 12(b)(6) standard, dismissal is inappropriate if a plaintiff pleads a claim that is plausible on its face. See Wood, 572 U.S. at 757–58; Iqbal, 556 U.S. at 677–80; Twombly, 550 U.S. at 554–63. "The plaintiff's complaint will not be dismissed as long as he provides sufficient detail about his claim to show that he has a more-than-conceivable chance of success on the merits." Owens, 767 F.3d at 396; see Wood, 572 U.S. at 757–58.

8

Lea, Watters, and Starling cite the principle that a plaintiff must not only establish a violation of a constitutional right but also that the constitutional right must have been clearly established at the time of the defendant's alleged constitutional violation. They then assert as a conclusion that "no existing precedent put it 'beyond debate' that the officers' actions violated the Constitution." [D.E. 46] 14; see [D.E. 62] 18. The court rejects their conclusion.

The events giving rise to this case began in 1976, and Watters's involvement began in 2005. As for Long's claims concerning the withholding of exculpatory evidence, in 1963 the Supreme Court decided Brady v. Maryland, 373 U.S. 83 (1963). In 1964, the Fourth Circuit held that law enforcement officers are part of the "prosecution" and must comply with Brady. See Barbee v. Warden, 331 F.2d 842, 846 (4th Cir. 1964) ("If the police allow the State's Attorney to produce evidence pointing to guilt without informing him of other evidence in their possession which contradicts this inference, state officers are practicing deception not only on the State's Attorney but on the court and the defendant."); see also Owens, 767 F.3d at 399. In 1976, the Fourth Circuit issued two published decisions overturning criminal convictions because police officers suppressed material exculpatory and impeachment evidence. See United States v. Sutton, 542 F.2d 1239, 1241–43 (4th Cir. 1976); Boone v. Paderick, 541 F.2d 447, 451–53 (4th Cir. 1976); see also Owens, 767 F.3d at 399. In 1989, the Fourth Circuit held that a "reasonable officer" acting in 1983 would have known that violating Brady "would violate the constitutional rights of the criminal defendants." Goodwin v. Metts, 885 F.2d 157, 161–62 (4th Cir. 1989), overruled in part on other grounds by Albright v. Oliver, 510 U.S. 266 (1994). Given these decisions and that the Fourth Circuit first applied Brady to the actions of law enforcement officers more than a decade before the events in this case began, Long's Brady rights were clearly established in 1976 and 2005.

As for Long's claims for denial of access to the courts, the Supreme Court recognized a

9

prisoner's constitutional right of access to the courts at least as early as 1941. See Ex parte Hull, 312 U.S. 546, 549 (1941). In 1977, the Supreme Court explained that after 35 years, the right was "established beyond doubt." Bounds v. Smith, 430 U.S. 817, 821–22 (1977), abrogated in part on other grounds by Lewis v. Casey, 518 U.S. 343 (1996). Thus, Long's right of access to the courts was clearly established in 1976 and 2005. See Finch v. Wilson Cnty., No. 5:19-CV-550-BO, 2020 WL 6532828, at *6 (E.D.N.C. Nov. 5, 2020) (unpublished).

As for Long's right to a fair trial, the citizens of the United States sought to guarantee fair criminal trials when they ratified Article III, Section 2 of the Constitution in 1788 and the Fifth and Sixth Amendments in 1791. For example, the Fifth Amendment states, in part: "No person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. In 1935, the Supreme Court stated that due process is not satisfied "if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through deception of court and jury. . . . Such a contrivance by a state to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." Mooney v. Holohan, 294 U.S. 103, 112 (1935) (per curiam). In 1967, the Supreme Court reiterated this principle: "[T]he Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence." Miller v. Pate, 386 U.S. 1, 7 (1967). Thus, Long's right to a fair trial free of knowingly falsified evidence was clearly established in 1976.

The constitutional rights Long asserts were clearly established when the events giving rise to Long's claims occurred. And, Long plausibly alleges his section 1983 claims against Lea, Watters, and Starling. Accordingly, the court denies without prejudice defendants' motions to dismiss based on qualified immunity.

10

C.

Lea, Watters, and Starling argue that public official immunity bars Long's North Carolina state-law claims. See [D.E. 46] 14–17. Public official immunity "shields public officials from personal liability for claims arising from discretionary acts or acts constituting mere negligence, by virtue of their office, and within the scope of their governmental duties." Bartley v. City of High Point, 873 S.E.2d 525, 533 (N.C. 2022). However, an official cannot claim immunity if the official's action was "(1) outside the scope of official authority, (2) done with malice, or (3) corrupt." Id. (citing Wilcox v. City of Asheville, 222 N.C. App. 285, 288, 730 S.E.2d 226, 230 (2012)). An act is malicious if it is "(1) done wantonly, (2) contrary to the actor's duty, and (3) intended to be injurious to another." Bartley, 873 S.E.2d at 534 (quotation omitted); see Wilcox, 222 N.C. App. at 289, 730 S.E.2d at 230. Evidence of constructive intent suffices when the "conduct is so reckless or so manifestly indifferent to the consequences, where the safety of life or limb is involved, as to justify a finding of willfulness and wantonness equivalent in spirit to an actual intent." Bartley, 873 S.E.2d at 534 (quotation omitted); see Foster v. Hyman, 197 N.C. 189, 192, 148 S.E. 36, 38 (1929); Wilcox, 222 N.C. App. at 289, 730 S.E.2d at 231. Put differently, a plaintiff must plausibly allege that "the level of recklessness of the officer's action was so great as to warrant a finding equivalent in spirit to actual intent." Wilcox, 222 N.C. App. at 292, 730 S.E.2d at 232. Taking the allegations in Long's amended complaint and all reasonable inferences drawn therefrom as true, Long has plausibly alleged that Lea, Starling, and Watters acted with a recklessness and a manifest indifference to the consequences of their actions that is equivalent in spirit to actual intent. Accordingly, the court denies without prejudice the motions to dismiss based on public official immunity.

D.

Starling died on November 24, 2019. Starling's Executrix Elizabeth Starling argues Long's claims against the estate are untimely under N.C. Gen. Stat. § 28A-19-3(a) and that the court should dismiss the claims. See [D.E. 62] 9–15; Fed. R. Civ. P. 12(b)(6).[1] Section 28A-19-3(a) states: "All claims against a decedent's estate which arose <u>before the death</u> of the decedent, . . . which are not presented to the personal representative or collector pursuant to G.S. 28A-19-1 by the date specified in the general notice to creditors . . . are forever barred against the estate, the personal representative, the collector, the heirs, and the devisees of the decedent." N.C. Gen. Stat. § 28A-19-3(a) (emphasis added). Section 28A-19-3(i) provides an exception if "the decedent or personal representative is protected by insurance coverage with respect to such claim." Id. § 28A-19-3(i). The deadline in the general notice to creditors for Starling's estate was October 17, 2020. See [D.E. 62-1].

Starling argues that Long did not file this action until May 3, 2021, which is after the deadline in section 28A-19-3(a) (i.e., October 17, 2020), and did not name Starling until filing the amended complaint on June 11, 2021, which is also after October 17, 2020. Starling also argues that no insurance exists that would cover Long's claims under section 28A-19-3(a). See [D.E. 62] 9–15.

On November 12, 2021, the Clerk of Wake County Superior Court reopened Starling's estate pursuant to N.C. Gen. Stat. § 28A-23-5, after finding proper cause to do so. See [D.E. 64-1] 2 (order

---

[1] The court rejects Starling's argument that the timeliness issue under N.C. Gen. Stat. § 28A-19-3 concerns this court's subject-matter jurisdiction or personal jurisdiction. See, e.g., United States v. Wong, 575 U.S. 402, 408–11 (2015); Sebelius v. Auburn Regional Med. Ctr., 568 U.S. 145, 153–54 (2013); Jones v. Bock, 549 U.S. 199, 215 (2007). Rather, it concerns whether Long has stated a claim upon which relief can be granted. See Wong, 575 U.S. at 408–11; Sebelius, 568 U.S. at 153–54; Jones, 549 U.S. at 215; Ragan v. Hill, 337 N.C. 667, 672–74, 447 S.E.2d 371, 374–76 (1994). The same conclusion holds true whether the court considers section 28A-19-3 a statute of limitations, a statute of repose, or a combination of each. See, e.g., CTS Corp. v. Waldburger, 573 U.S. 1, 16–17 (2014).

12

to reopen Starling's estate). The Clerk appointed Elizabeth Starling as the personal representative. See id. In the order reopening the estate, the Clerk expressly declined to address whether North Carolina's non-claim statute, N.C. Gen. Stat. § 28A-19-3, bars Long's claims in deference to this court's analysis. See id.

In opposition to Starling's arguments, Long notes that an estate can be reopened in order to assert a claim against a deceased tortfeasor. See, e.g., In re Estate of Miles, 262 N.C. 647, 655, 138 S.E.2d 487, 493 (1964). Long also notes that the Wake County Clerk of Court had the authority to reopen Starling's estate "for other proper cause" under N.C. Gen. Stat. § 28A-23-5 and did so on November 12, 2021. See [D.E. 64-1].

As for whether N.C. Gen. Stat. § 28A-19-3(a) bars Long's claims against Starling, Long argues that Felder v. Casey, 487 U.S. 131 (1988), forecloses Starling's reliance on section 28A-19-3(a). In Felder, the Supreme Court analyzed Wisconsin's notice-of-claim statute. Under Wisconsin's notice-of-claim statute, a plaintiff had to notify the state or local government entity or officer of the circumstances giving rise to the claim, the amount of the claim, and plaintiff's intent to hold the named defendant liable before filing suit in state court. Id. at 134. Moreover, Wisconsin's notice-of-claim statute also required that, in order to afford the defendant an opportunity to consider the requested relief, the claimant refrain from filing suit for 120 days after providing such notice. Id. Under the statute, failure to comply with the notice-of-claim statute provided grounds to dismiss the action. Id. The Supreme Court of Wisconsin held that the notice-of-claim statute applied to actions under 42 U.S.C. § 1983 filed in state court. Id. In Felder, the Supreme Court held that Wisconsin's notice-of-claim statute did not apply to actions brought in state court under 42 U.S.C. § 1983 due to federal preemption. See id. at 134–41.

Felder does not help Long. Unlike in Felder, N.C. Gen. Stat. § 28A-19-3 is not a notice-of-

13

claim statute. Rather, it is a non-claim statute. See Ragan, 337 N.C. at 672–74, 447 S.E.2d at 374–76. Non-claim statutes "are almost universally included in state probate codes." Tulsa Professional Collection Servs., Inc. v. Pope, 485 U.S. 478, 479 (1988). Under such statutes, creditors have a "limited time in which to file claims against the estate [in order to serve] the State's interest in facilitating the administration and expeditious closing of estates." Id. at 479–80. Thus, Felder does not defeat Starling's argument under section 28A-19-3.[2]

Alternatively, Long argues that N.C. Gen. Stat. § 28A-19-3(b) permits Long to pursue his claims against Starling's estate. Section 28A-19-3(b) provides that all non-contract "claims against a decedent's estate which arise at or after the death of the decedent . . . are forever barred . . . unless presented to the personal representative . . . . within six months after the date on which the claims arises." N.C. Gen. Stat. § 28A-19-3(b) (emphasis added). Long then argues that his claims against known wrongdoers did not arise until his conviction was vacated on August 27, 2020. See [D.E. 64] 13. As for Long's claims against Starling, Long argues that those claims did not arise until May 6, 2021, when the SBI disclosed the information upon which Long bases his claims against Starling. See id. at 14; cf. White v. Consol. Planning, Inc., 166 N.C. App. 283, 304–11, 603 S.E.2d 147, 162–66 (2001) (holding that equitable estoppel can apply in certain circumstances to toll a North Carolina statute of limitations). In turn, Long filed his amended complaint naming Starling on June 11, 2021, which falls within the six-month window in N.C. Gen. Stat. § 28A-19-3(b). See [D.E. 64]

---

[2] "[T]he accrual date of a section 1983 cause of action is a question of federal law that is not resolved by reference to state law." Wallace v. Kato, 549 U.S. 384, 388 (2007). However, the Supreme Court has held that courts must refer to state law for the length of the statute of limitations and for tolling rules. See id. at 394; Burnett v. Grattan, 468 U.S. 42, 48–49 (1984); Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996). Thus, the court properly examines N.C. Gen. Stat. § 28A-19-3, N.C. Gen. Stat. § 1-52(5), and North Carolina tolling rules in connection with the timeliness of Long's claims under 42 U.S.C. § 1983.

14

14.

Viewing the amended complaint in the light most favorable to Long, the court denies Starling's motion to dismiss pursuant to section 28A-19-3. In light of this conclusion, the court need not address the parties' dispute about whether the "insurance coverage" exception in N.C. Gen. Stat. § 28A-19-3(i) applies. Rather, the parties can engage in discovery with respect to insurance and other issues concerning section 28A-19-3 and present any applicable arguments at summary judgment.

III.

In sum, the court DENIES the motion to dismiss of defendants Lea and Waters [D.E. 45] and DENIES the motion to dismiss of defendant Starling [D.E. 61].

SO ORDERED. This 23 day of August, 2022.

JAMES C. DEVER III
United States District Judge